Brett L Eliason, Trustee
36 Timber Trail
Ramsey, New Jersey, 07446
801-949-0080
Brett.eliason1@gmail.com
 Plaintiff is Self-Represented "Pro Se"

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

50 Walnut Street, Newark, New Jersey, 07102

| | |
|---|---|
| **THE ESTATE OF MAX AND JOYCE ELIASON,** By and through their Trustees, heirs, and interested persons, including Plaintiffs herein. <br><br> **BRETT L. ELIASON, an individual;** <br><br> **VERONIQUE ELIASON, an individual;** <br><br> **KYLIE M. ELIASON, an individual;** <br><br> **BRITTNIE L. ELIASON, an individual.** <br><br><br> _____ <br> Plaintiff <br><br> v. <br><br> **THE UNITED STATES DEPT OF JUSTICE** <br><br> **THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS** <br><br> **DALLIN H. OAKS** <br><br> **KIRTON MCCONKIE, P.C.** <br><br> **CRAIG MCCULLOUGH, an individual** <br><br> **LISA STEPHENS, an individual** <br><br> **BRYAN STEPHENS, an individual** <br><br> **ELIASON EIGHT, LLC and ELIASON ENTERPRISES, LLC.** <br><br><br> _____ <br> Defendant | **AMENDED SUMMONS AND COMPLAINT FOR:** <br><br> • Statutory Accounting <br> • Declaratory and Injunctive Relief <br> • Imposition of Constructive Trust <br> • Appointment of Receiver <br> • Civil RICO Violations (18 U.S.C. § 1962) <br> • Fraud, Breach of Fiduciary Duty, and Civil Conspiracy <br><br> **WITH REQUEST FOR TEMPORARY RESTRAINING ORDER AND EMERGENCY RELIEF** <br><br><br><br><br><br><br><br> **Case No.   2:26-cv-03254** <br><br> **Judge:   Evelyn Padin** |

## I. INTRODUCTION

This case does not arise from a single dispute. It arises from a seven-year pattern of litigation across multiple jurisdictions; all centered on one issue that has never been answered: Where is the accounting of the estate of Max and Joyce Eliason, and the mineral rights from a multi-billion-dollar LLC which are now missing. These assets were entrusted to the LDS Church and Kirton McConkie 2013, and to this day they are unable to account for $1.00.

Since March of 2020, when Plaintiff initiated a civil RICO action in the United States District Court for the District of Utah, this matter has been presented before numerous state and federal courts, including proceedings in Hawaii, Texas, and Colorado. Despite the breadth, duration, and seriousness of these filings, **not one court has required a full statutory accounting of the estate assets**, nor has any court permitted the claims to be adjudicated on their merits before a jury. Every one of these actions—state and federal—has sought the same fundamental relief:

- **A statutory accounting**
- **Transparency of estate and trust assets**
- **Distribution to a named heir**

This action is presented to the New Jersey Court with the benefit of material information that was not previously available to Plaintiff and was not before prior courts.

At the time of earlier filings, Plaintiff understood the assets at issue to consist of family-held mineral interests of uncertain scope and value. While Plaintiff repeatedly sought accounting and transparency, those efforts were made without access to the full extent of the underlying asset base, and the ramifications against the respective Defendants. That has now changed.

Through recent review of recorded land records, historical conveyances, corporate filings, and market-based indicators, Plaintiff has identified that the assets at issue are not limited or incidental in nature, but instead comprise a substantial mineral estate assembled over decades and associated with large-scale oil and gas production.

The available data reflects that these assets span significant acreage across producing regions and, when evaluated under standard industry benchmarks, may reasonably be valued in the hundreds of millions, and potentially into the billions, of dollars.

The newly identified scale of the assets provides critical context for understanding why these issues have persisted. A matter that might otherwise be resolved through routine accounting has instead resulted in years of resistance, recharacterization of authority, and the absence of adjudication on the merits.

## II. LINCHPIN EVIDENCE REGARDING REPRESENTATION AND ADMISSION OF UNDISCLOSED CONFLICT OF INTEREST

Central to this case is a documented and admitted undisclosed conflict of interest, in which Defendants simultaneously purported to represent the settlors—Max and Joyce Eliason—while in fact representing a beneficiary whose interests were directly adverse. This conflict was acknowledged in substance on February 11, 2019, when a senior partner stated that Defendants did not represent the settlors and that legal action would be required to protect their rights. Below is a copy of Article 8.13 of the Joyce S. Eliason Trust dated October 28th, 2015 clearly identifying Craig McCullough and Kirton McConkie as the Settlors Counsel:

8.13 Notification of Attorney. If the Settlor has a serious illness or operation, the Settlor requests that the Trustees contact his attorney, Craig F. McCullough, KIRTON MCCONKIE, 50 East South Temple, suite 400, Salt Lake City, Utah 84111, (801) 328-3600, to obtain instructions in case the Settlor should die. If death makes this prior conversation impossible, then the Trustees should call said attorney as soon after death as possible.

### ARTICLE 9
### FORFEITURE

If any beneficiary under this Trust, and any trusts herein created, or intended to be created, shall contest in any court, without probable cause, any provision of this trust agreement, the Trustee shall distribute such beneficiary's share of any distribution as if such beneficiary had predeceased the Settlor.

IN WITNESS WHEREOF, the Settlor and Trustees have executed this trust agreement.

Max D. Eliason,                                           Max Eliason
Settlor and Co-Trustee

Joyce S. Eliason,
Co-Trustee

On February 23, 2019, attorney Thomas A. Mecham of Kirton McConkie confirmed in writing the scope of representation undertaken by the firm in connection with the estate of Joyce S. Eliason. In his email correspondence, Mr. Mecham expressly stated: "Craig McCullough of our office informed you that our firm represents your sister, Lisa Stephens, in her capacity as personal representative of your mother's estate and trustee of her trust."

**Thomas A. Mecham** <tmecham@kmclaw.com>    Sat, Feb 23, 2019, 3:00 PM
to George, Craig, me ▾

Dear Brett,

Thank you for your message. In our last (and only) meeting, I explained to you that we do not represent you and encouraged you to retain your own legal counsel, as the concerns you raised in our conversation clearly may affect your legal rights.

Following our meeting, Craig McCullough of our office informed you that our firm represents your sister, Lisa Stephens, in her capacity as personal representative of your mother's estate and trustee of her trust. Craig also sent you copies of Joyce's will and trust.

I am grateful to see that you have reached out to Mr. Burbidge. You will want to provide him with copies of the documents Craig recently sent to you. Once he has been engaged, I anticipate that Mr. Burbidge will reach out to Craig if he believes the issues you have raised have merit and should be brought to Lisa's attention. Of course, you may also reach out to Lisa directly.

Until you take these steps, however, there is nothing I can do for you, and there is no further reason to communicate with me or others occupying managerial roles within Kirton McConkie. Craig and Kirton McConkie represents Lisa. If you do not like something Lisa has done, the best person to consult is Lisa or Craig. Neither I nor anyone else at this firm (except for Craig) has any substantive knowledge regarding your mother's trust or estate. In other words, Craig will respond on behalf of, and has authority to speak for, Kirton McConkie.

The sense I get from your letter is that you are very concerned about this matter and that you are searching for anyone (including me) who might help you. I cannot help you because Craig and this firm has been hired to help your sister. You need to hire an attorney who is working on your behalf. This firm will respond to you or your attorney's concerns only through Craig. I cannot put it more simply than that.

I wish you all the best.

This statement constitutes a direct admission that Kirton McConkie was acting as legal counsel for Lisa Stephens in fiduciary roles tied to the estate and trust. However, this admission cannot be reconciled with the governing estate documents or with fundamental principles of fiduciary and trust law. The original trust instruments and last wills and testaments of Max D. Eliason and Joyce S. Eliason, both dated October 28, 2015, clearly establish that:

4

- Max D. Eliason was the **successor Trustee** upon the death of Joyce S. Eliason
- Brett L. Eliason and Max D. Eliason were named as **personal representatives**
- The trust explicitly identifies Kirton McConkie as attorneys to be contacted by the Trustees, meaning their role was to advise the Settlors and the duly appointed fiduciaries—not to supplant them

At the time of this email, Max D. Eliason was alive and had never lawfully relinquished his role as Trustee. No valid amendment existed that complied with the trust's execution requirements to remove him. Likewise, no lawful probate process had displaced him as a personal representative. Thus, Kirton McConkie's representation of Lisa Stephens in these fiduciary capacities necessarily required one of two conclusions:

- Either Max D. Eliason had been lawfully removed and replaced in accordance with the governing documents and applicable law; or
- Kirton McConkie knowingly disregarded the trust structure and assisted a beneficiary in assuming control without legal authority

**The documentary record establishes the latter.** The following Section 6.1 was taken from The Joyce S Eliason A/B executed on 10-28-15 clearly indicating Max D Eliason as the Successor Trustee, and Plaintiff as a Co-Trustee after the death of both Co-Settlors and Co-Trustees.

## ARTICLE 6
### TRUSTEE PROVISIONS

6.1    Trustee Succession.  The following will act as original Trustees, and as successor Trustees in the following order of succession:

(1)    Joyce S. Eliason and Max D. Eliason.  If either should cease or fail to serve, the survivor shall serve alone.

(2)    Mark Dean Eliason, Lisa Eliason Stephens and Brett Lynn Eliason.  If a Trustees should cease or fail to serve, the survivor(s) shall continue to serve.

(3)    A Trustee chosen by the majority of the beneficiaries voting by right of representation as defined in Section 8.8.6, with the natural or legal guardian voting for legally disabled beneficiaries.

5

It has already been determined that each document should be considered void due to the impermissible conflict of interest as this Trust and all other documents were prepared by Mr. Craig McCullough, who admittedly did not represent Max and Joyce Eliason. Nevertheless, any modification to this Trustee Succession would require the authorization from Max D Eliason, who was still legally competent at the time all respective amendments were signed.

As will be discussed within this filing in greater detail, Defendant Craig McCullough and Lisa Stephens utilized lethal doses of morphine and forced Joyce Eliason to execute a Second Amendment to the Joyce S Eliason Trust dated 10-28-15, and unlawfully appointed Lisa Stephens as Successor Trustee while erasing the name of her father Max Eliason as if he never existed. At the same time, Plaintiff was also removed leaving Lisa Stephens in complete control of all Trust assets. Joyce Eliason would fall into a morphine induced coma the day following the execution of this document.

> 6.1    Trustee Succession. The following will act as original Trustees, and as successor Trustees, in the following order of succession:
>
> 1.    Joyce S. Eliason.
>
> 2.    Lisa Eliason Stephens.
>
> 3.    A Trustee chosen by each of Settlor's descendants who are over the age of 25 and are not legally disabled, voting by right of representation as defined in Section 8.8.6, so there is one Trustee serving from each family line, who shall serve jointly. If all of the descendants of a Settlor's child are under age 25, the then serving Trustees of the Trust shall select a Trustee to represent that family line until a descendant reaches age 25.
>
> If a Trustee fails to accept trusteeship or after becoming Trustee fails or ceases to serve as Trustee for any reason, including disability, then the next listed Trustee shall automatically be appointed to serve as Trustee. In the discretion of the Trustee, additional Trustees may be added in the succession above indicated if more than the number of Trustees then serving is desired. If an institutional

If this was the only piece of evidence presented before the court, it should be sufficient for the Court to refer the matter to the appropriate authorities for criminal prosecution, and all documents prepared by Craig McCullough and Kirton McConkie be considered void.

The conflict is further amplified by the firm's own internal contradiction. The trust provisions explicitly direct that Kirton McConkie serve as legal counsel to the Settlors and Trustees in administering the estate. Yet, in practice, the firm:

- Refused to communicate with Brett L. Eliason
- Denied representing him or his father
- Directed him to obtain separate counsel
- Instructed that all communications must go through Craig McCullough, who was simultaneously acting on behalf of Lisa Stephens

This creates a critical and unavoidable inference: If Kirton McConkie were truly representing Lisa Stephens **solely in her fiduciary capacity as Trustee or Personal Representative**, then their duties would run to the trust and estate as a whole, including all beneficiaries and co-fiduciaries. Under such circumstances, there would be no basis to exclude a co-equal beneficiary or named fiduciary from communication or require them to retain separate counsel merely to receive information about the administration of the trust.

However, Mr. Mecham's directive that Brett L. Eliason must obtain independent counsel—and that the firm would communicate only through Craig McCullough—demonstrates that Kirton McConkie was, in reality, representing Lisa Stephens in her **individual capacity as a beneficiary whose interests were adverse to other beneficiaries and fiduciaries**. This constitutes an undisclosed conflict of interest.

Under **Utah Rules of Professional Conduct Rule 1.7**, a lawyer shall not represent a client if the representation involves a concurrent conflict of interest, including where:

- The representation of one client will be directly adverse to another client; or
- There is a significant risk that the representation will be materially limited by responsibilities to another client

Further, under **Rule 1.13 (Organization as Client)** and well-established fiduciary principles, counsel representing a trust or estate must act in the best interests of the entity and its beneficiaries as a whole—not favor one beneficiary to the detriment of others.

Here, Kirton McConkie undertook representation that was:

- Adverse to the rightful Trustee (Max D. Eliason)
- Adverse to a named personal representative and beneficiary (Brett L. Eliason)
- Beneficial to a single individual (Lisa Stephens), whose authority itself is derived from disputed and invalid documents

The conflict was never disclosed, never waived, and never adjudicated. Instead, the firm now characterizes allegations of conflict as unfounded, despite their own written admission confirming the exact structure of representation that gives rise to the conflict. This leads to the same unavoidable legal conclusion presented throughout this Complaint:

- **If Kirton McConkie represented the trust and estate, then their exclusion of rightful fiduciaries and beneficiaries constitutes a breach of fiduciary duty and professional misconduct.**
- **If Kirton McConkie represented Lisa Stephens individually, then their actions in assisting her to assume control over the trust and estate constitute participation in a scheme to deprive other beneficiaries of their rights and interests.**

Either scenario establishes liability, and there is no lawful interpretation under which these actions are permissible.

**This case is, at its core, remarkably simple.** It does not require complex legal analysis, prolonged discovery, or competing expert testimony. It turns on a single, fundamental question—one that Defendants have avoided for years, and one that no court has required them to answer:

**Do Defendants, including Kirton McConkie, claim to represent the interests of the Settlors, Max and Joyce Eliason, and the trusts created for the benefit of their heirs, while simultaneously representing and favoring one beneficiary to the exclusion of others?**

YES ☐     NO ☐

This is not a rhetorical question. It is a legal one. Because under well-established principles of fiduciary and trust law, the answer determines everything. This is what the principal of "Res Ipsa Loquitur" was designed for.

8

## The Legal Consequence of the Answer

**If the answer is yes,** then Defendants have admitted to an **undisclosed conflict of interest** (which they already have) but this supports it. Such a conflict is not a minor procedural defect. It is a fundamental breach of fiduciary duty that strikes at the heart of the attorney-client and trustee-beneficiary relationships. Under longstanding legal principles, including the **Restatement (Third) of Trusts** and governing fiduciary law:

- A fiduciary must act impartially among beneficiaries;
- An attorney cannot represent adverse interests without full disclosure and informed consent;
- Transactions arising from undisclosed conflicts are **voidable** and subject to rescission;

In such circumstances, the law requires that the parties be restored to the position they would have occupied: **as if the conflicted relationship had never occurred.**

This includes:

- unwinding transactions;
- restoring control of assets;
- imposing constructive trusts where necessary;

**If the answer is no,** then Defendants face a different but equally fatal consequence. Because the documentary evidence—including trust instruments and related filings—demonstrates that Defendants have repeatedly asserted authority over the trusts and estates of Max and Joyce Eliason. If Defendants now deny such representation, then they must explain:

- by what authority they controlled trust and estate assets;
- by what authority they excluded Plaintiffs;
- by what authority they withheld accounting and distributions;

Either position leads to liability.

**THERE IS NO THIRD OPTION**.

Notwithstanding the procedural posture of this case and any briefing schedules that may permit a twenty-one (21) day response period, the Court should recognize that Plaintiffs' injuries are not theoretical or prospective—they are ongoing and severe. Even assuming, arguendo, that

Defendants attempt to justify delays based upon unresolved questions regarding certain asset classes, including oil and gas distributions, no legitimate explanation exists for the complete deprivation of Plaintiff Brett L. Eliason's inheritance.

Plaintiff's mother passed away in May of 2018, at which time her estate assets were distributed. Yet, to date, Plaintiff has not received nor been provided an accounting for a single dollar of those distributions. Following the death of Plaintiff's father in October of 2024, the same pattern has continued—no distributions, no accounting, and no justification. At no time have Defendants disputed that Plaintiff is a lawful heir and beneficiary. Accordingly, the continued withholding of all distributions, coupled with the complete absence of accounting, cannot be attributed to legitimate estate administration. Rather, it reflects a deliberate and ongoing deprivation of Plaintiff's property rights.

The law does not permit a beneficiary to be indefinitely excluded from his inheritance under the guise of litigation, particularly where no findings of wrongdoing have been made and no lawful basis for withholding distributions has ever been articulated. Whether the Department of Justice elects to investigate or prosecute the conduct described herein, including alleged violations of federal RICO statutes, is a matter within its discretion. That issue, however, is not the primary focus of this action.

What is both striking and deeply troubling is the continued refusal of the judicial system to intervene in the face of clear and ongoing harm to Plaintiffs, and to require Defendants— including Kirton McConkie and affiliated entities—to perform the most basic legal obligation owed under trust and fiduciary law: to account for the estate they were engaged to protect.

The record reflects not only the absence of such accounting, but the systematic removal and control of assets through a network of trusts and related entities, coupled with years of retaliatory conduct directed at Plaintiffs. This Court is not being asked to resolve every allegation of wrongdoing, but rather to enforce the rule of law by requiring transparency, restoring accountability, and halting conduct that, if left unchecked, undermines the very foundation of fiduciary responsibility.

The significance of this fact cannot be overstated. It is not one exhibit among many. It is the opening fracture in the entire façade. Once seen, it cannot be unseen. Once acknowledged, it demands explanation. And if Defendants cannot explain this obvious and unlawful conflict of interest, then the remaining pages of this complaint cease to look like exaggeration and instead begin to read exactly as they are: supporting evidence showing to what extent Defendants have gone to conceal their long list of crimes.

The truth of the matter is simple; the obvious and admitted conflict of interest confirms that:

1. All documents prepared by Craig McCullough should be **considered void.**
2. The introductory meeting held in 2013 was under **Fraudulent Misrepresentation.**
3. All monies received by Craig McCullough were done under the knowledge the act was unlawful thereby classifying said payments as **Bribery.**
4. All documents created from 2013 to the present are **Fraudulent.**
5. All funds diverted through Eliason Eight, LLC, and Eliason Enterprises, LLC represent **Embezzlement.**
6. Plaintiff Greg Moesinger is **unlawfully representing Eliason Eight, LLC;** and that his recent letter dated March 6th, 2026 depriving Plaintiff of his rightful income and assets is criminal **Extortion.**
7. Defendants have committed undeniable **Abuse and Exploitation of Vulnerable Adults and Children** as Craig McCullough took advantage of an 84-year-old woman with lung cancer, and an 84-year-old man with dementia; while denying minors their rightful inheritance.
8. There is an undeniable **Breach of Fiduciary Duty.**
9. There is an undeniable **Conflict of Interest.**
10. Craig McCullough **is Interfering with an Inheritance.**
11. All monies transferred via wire constitute **Wire Fraud.**
12. Craig McCullough has **Interfered with Economic Relationships.**
13. Plaintiffs are working in an **aggravated Conspiracy.**
14. Plaintiffs are intentionally committing **Intentional Infliction of Emotional Distress.**
15. The removal of Brett Eliason as manager represents **Securities Fraud.**
16. The removal of Max D Eliason and Brett Eliason as personal representative and successor Trustees is considered **Forgery and Fraud.**
17. All actions and filings including those herein are considered **Aggravated Retaliation against Victims.**
18. Statements made by Greg Moesinger in Court regarding Brett's ownership of Eliason Enterprises reflect **Perjury.**
19. Failure to account for and create fraudulent notes due from Defendant represent **Accounting Fraud.**
20. Plaintiffs are committing crimes of Retaliation Against Victims, **Aiding and Abetting and Obstruction of Justice** with every filing they now make.
21. Plaintiff's contact with third party recipients of Defendant's subpoena represents **Witness Tampering and Coercion.**

22. The eviction of Defendant from his own home in February of 2024 constituted **Unlawful Seizure of Property.**

23. The deprivation of Defendant's rights to see his own father; and the filing of **Fraudulent Court Documents** suggesting Brett and Veronique Eliason were divorced, reflects **Interference of Familial Relationships.**

24. The removal of Max D Eliason as Settlor of his own Trust is and **Aggravated Conspiracy to Commit Multiple Counts of Fraud.**

25. There is an undeniable claim that all statements listed herein, and many that are not shown or unknown represent **both Racketeering, and undeniable Corruption.**

### NOT ONE OF THESE ALLEGATIONS HAS BEEN DENIED BY DEENDANTS

The Defendants are not entitled to enjoy the freedoms of being immune to the laws while depriving Plaintiff of the most basic right to defend himself in an action they brought themselves. To allow the Defendants who are the key players in the alleged crimes to openly assault Plaintiff and his family as victims should not only be prohibited, but the court should refer each of them to the appropriate authorities for criminal prosecution.

The sections that follow are therefore not presented to manufacture suspicion where none existed. They are presented to demonstrate that the suspicion created by this threshold conflict was repeatedly reinforced by later events, documents, communications, and conduct. In that sense, the evidence that follows is not the origin of the problem. It is the accumulating record of what flowed from it. With that threshold issue established, I turn next to the factual background and subsequent events that further informed my understanding of Plaintiffs' conduct and formed the basis for the statements they now challenge as defamatory.

### NATIONWIDE PATTERN OF NON-ADJUDICATION

Plaintiffs incorporate all preceding paragraphs. Plaintiffs have pursued relief across multiple jurisdictions within the United States, including but not limited to:

- The State of Utah
- The State of Hawaii
- The State of Texas
- The State of Colorado

Across these jurisdictions, Plaintiffs have presented claims involving:

- Deprivation of property

- Fiduciary misconduct
- Failure to provide statutory and beneficiary accountings
- Allegations implicating violations of federal law

Despite the breadth, duration, and consistency of these filings:

1. No court has compelled full evidentiary development of the claims;
2. No court has required clear, binary responses to central factual issues;
3. No tribunal has ordered comprehensive statutory accounting despite repeated requests;
4. No proceeding has progressed to a full adjudication on the merits before a neutral factfinder.

---

## FAILURE OF ENFORCEMENT MECHANISMS

Plaintiffs further allege that federal authorities, including Defendant United States Department of Justice, have been placed on notice of the foregoing pattern. Such notice includes allegations of conduct that, if proven, would implicate federal statutes, including but not limited to:

- Obstruction of justice
- Fraud affecting property interests
- Potential violations of federal racketeering statutes

Despite such notice:

- No coordinated federal inquiry has been initiated;
- No intervention has occurred to ensure access to adjudication;
- No mechanism has been provided through which Plaintiffs may obtain enforcement of federal law.

## EFFECT OF SYSTEMIC INACTION

The combined effect of judicial non-adjudication and enforcement inaction is the creation of a legal condition in which:

- Rights exist in theory but not in practice;
- Claims may be filed but never heard;
- Evidence may be submitted but never tested;
- Remedies may exist but are never reachable.

This condition is indistinguishable from a complete denial of due process.

13

**DENIAL OF MEANINGFUL ACCESS TO JUSTICE**

Plaintiffs do not allege mere error; Plaintiffs allege the absence of any functioning pathway through which their claims can be heard and resolved. The Constitution guarantees more than the existence of courts. It guarantees **access to justice**. Where that access is systematically unavailable across jurisdictions, the deprivation is national in scope.

This case presents a threshold issue that cannot be resolved within any single underlying proceeding: Whether a citizen may be denied meaningful adjudication in every available forum without federal intervention. Absent recognition by this Court:

- Plaintiffs have no remaining forum
- No remaining remedy
- No remaining mechanism to enforce constitutional rights

---

## III. PREEMPTIVE RESPONSE TO ANTICIAPTED DEFENSE OF "VEXATIOUS LITIGANT" (translation – we cannot respond to Plaintiffs' questions).

### A. Overview of Anticipated Defense

1. Plaintiffs anticipate that Defendants will attempt to characterize Plaintiff Brett L. Eliason as a "vexatious litigant" to discredit the claims asserted herein and avoid adjudication on the merits.

2. Plaintiffs further anticipate that Defendants will reference the number of prior filings initiated by Plaintiff over the past several years, while omitting the procedural history and context of those proceedings.

3. This anticipated characterization is misleading, incomplete, and legally irrelevant to the claims presented in this action.

### B. Prior Actions Were Never Adjudicated on the Merits

4. Plaintiffs allege that none of the prior actions filed by Plaintiff Brett L. Eliason concerning the subject matter of this case have been resolved on their merits.

5. Specifically, Plaintiffs allege that:

a. no prior action has proceeded to a full evidentiary hearing;

b. no prior action has been presented to a jury;

c. no court has issued findings of fact or conclusions of law addressing the substance of Plaintiff's allegations;

6. Instead, prior actions were dismissed or otherwise terminated on procedural grounds, without adjudication of the underlying claims.

7. Accordingly, any attempt to characterize prior filings as "unsuccessful" is misleading, as the claims have not been substantively evaluated.

## C. Pattern of Filings Reflects Repeated Attempts to Obtain Statutory Accounting

8. Plaintiffs allege that each prior action filed by Plaintiff arises from the same core issue: the refusal of Defendants to provide a lawful statutory accounting of estate and trust assets.

9. Plaintiffs further allege that such requests for accounting are not extraordinary claims, but rather fundamental rights under trust and fiduciary law.

10. The repeated filing of actions seeking the same statutory relief reflects not abuse of process, but the continued denial of legally required disclosures.

11. Plaintiffs assert that, had Defendants complied with their obligations at any point, no further litigation would have been necessary.

## D. Context of Financial Hardship and Related Litigation

12. Plaintiffs anticipate that Defendants may reference prior litigation involving Plaintiff Brett L. Eliason as evidence of frivolous or excessive filings.

13. Plaintiffs allege that such characterization omits critical context, including:

a. that prior litigation included actions brought by creditors;
b. that such creditor actions arose following the loss of control over Plaintiff's assets and income streams;
c. that such financial hardship is directly related to the conduct alleged herein;

14. Plaintiffs assert that Defendants cannot rely upon circumstances allegedly caused by their own conduct as evidence to discredit Plaintiff.

15

### E. Pro Se Status and Lack of Access to Counsel

15. Plaintiff Brett L. Eliason and other Plaintiffs appear pro se in this matter.

16. Plaintiffs allege that this is not by preference, but by necessity.

17. Plaintiffs further allege that, within the State of Utah, all attorneys who have been contacted have declined representation in matters involving Defendants, including Kirton McConkie and affiliated entities.

18. Plaintiffs assert that lack of representation should not be construed as a reflection on the merits of the claims, but rather as an indicator of the practical barriers to obtaining legal counsel in this context.

### F. Fiduciary Duty of Impartiality

19. Plaintiffs allege that Defendants owed fiduciary duties to the Settlors, Max and Joyce Eliason, including the duty to act impartially among beneficiaries.

20. See, e.g., **Uniform Trust Code § 803** (Duty of Impartiality); **Restatement (Third) of Trusts § 79**.

21. Plaintiffs further allege that Defendants have failed to uphold this duty by favoring certain beneficiaries while excluding Plaintiffs from information and participation.

22. The existence of this duty is independent of any characterization of Plaintiff and cannot be avoided through labeling or procedural defenses.

### G. Vexatious Designation Does Not Eliminate Substantive Rights

23. Plaintiffs assert that any prior designation of Plaintiff as a vexatious litigant does not:
    a. extinguish Plaintiffs' rights as beneficiaries;
    b. relieve Defendants of fiduciary obligations;
    c. eliminate statutory duties to provide accounting;

24. Nor does such designation authorize Defendants to withhold financial information or avoid judicial scrutiny.

25. Plaintiffs further assert that constitutional principles of due process require that claims be capable of adjudication on their merits.

### H. Relevance to This Action

26. The claims asserted in this action are supported by documentary evidence, including trust instruments, correspondence, and financial records.

27. The central issue presented—Defendants' refusal to provide a statutory accounting—has not been adjudicated in any prior proceeding.

28. Accordingly, any attempt to dismiss or diminish the present action based on prior filings would be improper.

---

## IV. ATTORNEY-FILED COMPLAINTS CONFIRMING LONGSTANDING ALLEGATIONS

This matter is not based solely on allegations made by a pro se litigant. Years prior to the filing of this action, **licensed attorneys from established law firms independently investigated and formally asserted substantially identical claims** against many of the same Defendants.

These filings are attached as:

- **Exhibit A** – Amended Complaint filed September 2019 by attorneys Jaryl Rencher, Michael Collins, and Benjamin Lusty
- **Exhibit B** – Complaint filed August 2023 by attorneys John Snow, Angus Edwards, and Mindy Kidd

## A. The 2019 Rencher Complaint

In 2019, Plaintiff, through counsel, filed a comprehensive complaint alleging:

- Civil conspiracy to control and divert estate and trust assets
- Fraud and breach of fiduciary duty
- Improper amendments to trust documents
- Removal of Plaintiff as trustee and manager without authority
- Failure to provide required accountings

The complaint further alleged that:

- Trust amendments were executed under questionable circumstances, including diminished capacity and undue influence
- Attorneys associated with Kirton McConkie participated in drafting and executing those amendments
- Plaintiff was systematically deprived of access to financial information and distributions

## B. The 2023 Snow Complaint

In 2023, Plaintiff again retained counsel—this time through the firm Parsons Behle & Latimer—to pursue substantially the same relief. That complaint likewise demanded:

- A full accounting of all trust and company assets
- Disclosure of financial records and transactions
- Clarification of fiduciary roles and authority
- Explanation of conflicts of interest involving Kirton McConkie

As stated in **Exhibit D, page 3 of this complaint**, the action specifically sought: "a full and complete accounting… and access to all documents permitted by statute or agreement." The complaint further documented:

- Repeated written demands for records
- Partial and incomplete responses
- Refusal to answer direct questions regarding representation and conflicts
- Continued failure to produce required financial documentation

## C. Independent Legal Corroboration of the Same Core Issue

These complaints—filed four years apart by separate legal teams—arrive at the same unavoidable conclusion: **Plaintiff has been denied access to accounting, financial records, and distributions to which he is legally entitled.**

Notably:

- These complaints were filed **before any vexatious litigant designation**
- They were prepared by **licensed attorneys bound by Rule 11 obligations**
- They contain **substantially identical factual allegations and legal claims**
- And they were supported by documentary evidence available at the time

## D. The Absence of Adjudication on the Merits

Despite the seriousness of the allegations raised in both actions:

- No full evidentiary hearing was conducted
- No jury trial was permitted
- No comprehensive accounting was ordered
- And no Defendant was required to fully respond to the core allegations

Instead, the claims were never adjudicated on their merits.

18

## E. The Significance for This Court

This history is critical for one reason: **The allegations presented in this Complaint are not new. They are the continuation of claims repeatedly raised, documented, and supported by legal counsel over a period of years.** If the Court were to disregard Plaintiff's allegations solely on the basis that he now proceeds pro se, it would necessarily ignore:

- The prior work of licensed attorneys
- The documented legal claims already asserted
- And the unresolved demand for accounting that has persisted across every filing

## F. The Unanswered Question Remains

Across all proceedings—2019, 2023, and now—one issue has remained constant: **No Defendant has provided a complete accounting of the estate, trusts, or associated entities.** And no court has compelled one. Is it the court's opinion that these complaints are also considered "vexatious?"

---

## V. IMMEDIATE AND IRREPARABLE HARM WARRANTING TEMPORARY RESTRAINING ORDER

## A. This Is Not a Theoretical Dispute — It Is an Ongoing Deprivation of Property and Rights

Plaintiff is not seeking relief based on speculative or future harm The harm is **present, active, and escalating**. Defendants are currently:

- withholding all trust accountings and financial disclosures
- exercising control over trust and LLC assets without transparency
- depriving Plaintiff of distributions and economic benefit
- asserting authority over entities in which Plaintiff holds vested ownership interests

At the same time, Plaintiff is being:

- denied meaningful access to the courts
- blocked from obtaining discovery
- prevented from presenting evidence in a full hearing

This combination has created a system in which:

**Defendants maintain total control over the assets, while Plaintiff is denied any mechanism to challenge that control.**

## B. The Defendants Are Using Litigation as a Weapon — Not A Forum for Resolution

The lawsuits filed in Utah were not initiated to resolve legitimate disputes.

They were initiated:

- without full disclosure of underlying financial records
- without providing required trust documentation
- while refusing to produce evidence supporting their claims

Despite placing Plaintiff into litigation, Defendants have:

- refused to provide discovery
- objected to subpoenas
- declined to identify the specific statements at issue
- resisted depositions

At the same time, they continue to:

- rely on Plaintiff's own writings as "evidence"
- while selectively ignoring the underlying factual allegations

This creates a procedural trap: Plaintiff is forced to defend himself in litigation while being denied access to the very evidence necessary to do so.

## C. Denial of Due Process Through Refusal of Hearings and Discovery

Plaintiff has repeatedly sought:

- emergency hearings
- judicial intervention
- enforcement of statutory rights to accounting
- the ability to conduct discovery

These requests have been:

- ignored
- denied without substantive explanation

- or rendered meaningless through procedural barriers

As demonstrated in prior proceedings:

- Plaintiff's attempts to obtain hearings were blocked
- motions raising core issues were not addressed on the merits
- discovery necessary to establish the truth has been effectively prevented

This has resulted in a system where:

**Plaintiff's claims are never adjudicated, while Defendants continue to act unchecked.**

## D. The Vexatious Litigant Designation Is Being Used to Silence, Not Protect the Court

Rather than serving its intended purpose, the vexatious litigant designation has been used as a shield to:

- restrict Plaintiff's ability to file motions
- justify denial of hearings
- avoid addressing substantive issues

As outlined previously, the designation arose during a period in which Plaintiff was:

- demanding statutory accounting
- seeking to preserve his home
- attempting to enforce fiduciary duties

The continued reliance on that designation now serves to:

**prevent judicial scrutiny of Defendants' conduct while allowing ongoing harm to continue.**

## E. Irreparable Harm Is Occurring Daily

The harm to Plaintiff is not compensable through monetary damages alone.

Plaintiff is suffering:

## 1. Financial Destruction

- complete cutoff of income and distributions
- loss of control over business interests
- inability to access assets tied to his ownership

## 2. Loss of Property Rights

- removal from management roles
- deprivation of ownership benefits
- inability to protect or oversee assets

## 3. Evidentiary Harm

- ongoing control of records by Defendants
- risk of alteration, concealment, or destruction of financial evidence

## 4. Constitutional Harm

- denial of due process
- denial of meaningful access to the courts
- inability to confront and challenge adverse claims

Courts consistently recognize that:

**loss of control over property, combined with denial of access to evidence and judicial review, constitutes irreparable harm, so why doesn't this one?**

## F. Exhibits Confirm the Pattern of Obstruction

Plaintiff incorporates as supporting exhibits:

- Prior demands for accounting and statutory compliance
- The Response and Counter-Complaint filed in the Scott matter
- Filings demonstrating repeated requests for hearings and relief
- Evidence of Defendants' refusal to provide discovery

These filings show a consistent pattern:

- Plaintiff asks for transparency
- Defendants refuse
- Plaintiff seeks court intervention
- The court declines to act
- Defendants continue exercising control

## G. Without Immediate Relief, The Status Quo Will Continue to Cause Irreparable Damage

Absent a Temporary Restraining Order:

22

- Defendants will continue to control all assets
- Plaintiff will remain cut off from income and ownership rights
- critical evidence will remain solely in Defendants' possession
- Plaintiff will continue to be denied meaningful judicial review

This is not preservation of the status quo.

---

## VI. THE MOESINGER LETTER: COERCION, RETALIATION, AND FINANCIAL EXCLUSION AS A WEAPON

## A. Overview of the March 6, 2026 Letter (See Exhibit C).

1. On or about March 6, 2026, counsel for Eliason Eight, LLC, Gregory S. Moesinger of Kirton McConkie, issued a written communication to Plaintiff Brett L. Eliason accusing him of fraud, criminal conduct, and interference with company operations.

2. The letter further demanded that Plaintiff immediately withdraw certain filings and communications, and threatened legal action, criminal referral, and financial consequences if such demands were not met.

3. Most critically, the letter expressly states that:

"Eliason Eight will not make additional distributions to you until this has been fully investigated…"

4. This statement constitutes the **intentional suspension of Plaintiff's only remaining source of income**, imposed unilaterally by parties who exercise control over assets in which Plaintiff holds an ownership and beneficiary interest.

## B. Conditioning Financial Survival on Compliance with Demands

5. The March 6, 2026 letter conditions the restoration of Plaintiff's income upon his compliance with Defendants' demands, including:

   a. withdrawal of filings with the State of Utah;
   b. rescission of communications to third-party payors;
   c. disclosure of information for Defendants' internal use;

23

6. The letter further asserts that failure to comply will result in:

- o continued withholding of distributions;
- o offset of alleged damages against Plaintiff's ownership interest;
- o civil litigation;
- o referral for criminal prosecution;

7. This structure presents Plaintiff with a coercive ultimatum: comply with Defendants' demands or lose the financial means necessary to survive.

## C. Economic Coercion and Civil Extortion

8. Plaintiffs allege that the conduct described in the March 6, 2026 letter constitutes **economic coercion** and is consistent with civil extortion.

9. Under federal law, extortion includes the obtaining of property or advantage through wrongful use of:

- o fear (including fear of economic harm);
- o threats of legal or criminal action when used improperly as leverage;

See **18 U.S.C. § 1951 (Hobbs Act)**.

10. Plaintiffs further allege that Defendants used:

- control over Plaintiff's financial distributions;
- threats of criminal referral;
- threats of litigation and forfeiture;

as leverage to compel Plaintiff to abandon lawful actions and assertions of his rights.

11. The use of financial deprivation as a means of coercion transforms an otherwise civil dispute into conduct actionable under federal law.

## D. Retaliation Against a Beneficiary and Member

12. Plaintiffs allege that the suspension of distributions was not a neutral business decision, but a retaliatory act.

13. The timing of the letter—following Plaintiff's efforts to assert control rights and seek transparency—demonstrates a causal connection between:

- Plaintiff's protected actions; and
- Defendants' punitive response;

24

14. Plaintiffs further allege that Defendants:

- identified Plaintiff's remaining income source;
- exercised control over that income;
- deliberately cut off that income to exert pressure;

15. Such conduct constitutes **intentional infliction of financial harm** and is inconsistent with any legitimate fiduciary obligation.

## E. Breach of Fiduciary Duty and Duty of Good Faith

16. Defendants, acting in fiduciary and managerial capacities, owed duties of:

- loyalty;
- care;
- good faith;
- fair dealing;

17. Instead of protecting Plaintiff's interests as a beneficiary and member, Defendants:

- used those interests as leverage;
- deprived Plaintiff of distributions without due process;
- asserted unilateral authority to offset unproven claims;

18. Such conduct constitutes a clear breach of fiduciary duty under applicable trust and corporate law.

## F. Integration into RICO Predicate Conduct

19. Plaintiffs allege that the conduct described herein forms part of a broader pattern of racketeering activity.

20. Specifically, the use of threats, coercion, and financial control may constitute predicate acts under:

- **18 U.S.C. § 1951 (Extortion);**
- **18 U.S.C. § 1343 (Wire Fraud),** to the extent communications were transmitted electronically;

21. The March 6, 2026 letter is not an isolated incident, but part of a continuing scheme to:

- control assets;

- silence Plaintiff;
- prevent exposure of underlying conduct;

## G. Immediate Harm and Basis for Emergency Relief

22. The suspension of distributions has caused immediate and ongoing harm to Plaintiffs, including:

- loss of income necessary for daily living;
- inability to access assets or benefits;
- financial instability and risk of displacement;

23. This harm is ongoing and cannot be remedied solely through monetary damages.

24. The conduct described herein is a primary basis for Plaintiffs' request for emergency relief, including restoration of the status quo.

## H. The Language and Tone of the Letter

25. The March 6, 2026 letter concludes with the phrase: "Very truly yours,"

26. Plaintiffs allege that this formal closing, juxtaposed against accusations of criminal conduct and the withholding of essential income, underscores the calculated and deliberate nature of the communication.

27. The tone reflects not neutrality or professionalism, but confidence in the ability to impose severe consequences without immediate accountability.

## I. Ethical and Public Policy Implications

28. Plaintiffs respectfully submit that allowing fiduciaries and controlling parties to:

- accuse beneficiaries of criminal conduct;
- unilaterally cut off financial support;
- condition restoration of income on compliance with demands; would set a dangerous precedent.

29. Such conduct, if left unchecked, permits those entrusted with the protection of assets to instead weaponize those assets against the very individuals they are obligated to protect.

30. The law does not permit fiduciaries to transform inheritance into leverage, nor to convert financial dependence into coercion.

31. Plaintiffs further submit that the gravity of such conduct may appear implausible precisely because of its severity; however, the documentary evidence speaks for itself.

---

## VII. DUPLICATIVE LITIGATION AND PROCEDURAL OBSTRUCTION AS A TOOL OF RETALIATION

Plaintiffs allege that Defendants, acting in concert, initiated and maintained **multiple, substantially identical legal actions** against Brett L. Eliason simultaneously, not for the legitimate resolution of disputes, but as part of a coordinated effort to overwhelm, silence, and financially exhaust him claiming defamation of character. The complaints seek millions of dollars in damages. Defendants filed two defamation complaints simultaneously under Judge Laura Scott (McCullough vs Eliason Ut Case no.250908727) and Judge Todd Shaughnessy (Stephens vs Eliason Ut Case no. 250908740) in the Third District Court of Salt Lake County Utah on or about October 31st, 2025.

Plaintiff filed a response and counter-complaint in both November of 2025, and February of 2026; neither of which has been responded to, and both of which fall under the definition of a SLAP.

Upon review of the complaints filed against Brett L. Eliason, it is evident that:

1. The actions are materially duplicative in substance, parties, and allegations;
2. The timing of the filings suggests coordination rather than coincidence;
3. The proceedings were structured in a manner designed to maximize procedural burden rather than judicial efficiency;

## A. Intentional Multiplication of Proceedings

Rather than litigating claims in a single forum, Defendants pursued parallel actions, forcing Defendant Brett L. Eliason to respond simultaneously across multiple cases involving:

- The same core factual allegations;

27

- The same operative documents;
- The same underlying dispute regarding the Eliason estate;

This conduct had the foreseeable and intended effect of:

- Multiplying legal costs;
- Creating procedural confusion;
- Diverting resources from substantive defense;

## B. Strategic Freezing of Discovery

Compounding this burden, Plaintiffs in those actions—many of whom are Defendants in this matter—have:

- Refused to produce documents;
- Asserted boilerplate objections;
- Blocked subpoenas;
- Avoided meaningful participation in discovery;

At the same time, the courts overseeing those matters have **failed to compel compliance**, resulting in a complete standstill in discovery.

## C. Denial of Access to Jury Determination

Despite the absence of meaningful discovery and the Defendants' refusal to produce evidence, Brett L. Eliason has:

- Expressly stated readiness to proceed to trial;
- Requested resolution before a jury;

Yet, the structure of these proceedings has effectively prevented any such adjudication, leaving the matter suspended while:

- Financial pressure escalates;
- Access to evidence remains blocked;
- Substantive resolution is indefinitely delayed;

## D. Failure to Respond to Counterclaims

In those same actions, Plaintiffs have further:

- Failed to respond to duly filed counterclaims;

28

- Ignored substantive allegations;
- Avoided addressing the central issues raised;

Despite this, no meaningful enforcement action has been taken by the courts to require compliance.

## E. Pattern of Retaliatory Legal Abuse

When viewed in conjunction with the broader factual record, including:

- The Moore/Moesinger correspondence;
- The restriction of subpoenas;
- The coordinated positions of counsel;

These duplicative proceedings form part of a **pattern of retaliatory conduct**, the purpose of which is to:

- Suppress Plaintiffs' claims;
- Prevent exposure of underlying misconduct;
- Exhaust Plaintiffs' financial and emotional resources;

## F. Necessity of Federal Intervention

As a result of these coordinated actions and procedural barriers, Plaintiffs bring this matter before this Court seeking:

- A unified forum;
- Enforceable discovery;
- Neutral adjudication;

Free from the procedural manipulation that has characterized prior proceedings.

## VIII. Interference with Judicial Process and Third-Party Testimony

In addition to the conduct described above, Plaintiffs allege that Defendants engaged in actions that **interfered with the normal functioning of the judicial process**, including efforts affecting subpoenas and third-party participation.

In connection with related proceedings, Plaintiffs sought to obtain testimony and information through lawful process, including the issuance of a subpoena directed to a judicial officer connected to prior matters involving the parties.

This subpoena was issued for the purpose of:

- Clarifying prior rulings and actions
- Establishing the factual record surrounding earlier proceedings
- And obtaining testimony relevant to issues raised in this case

## A. Opposition to Subpoena by Defendants' Counsel

In response to that subpoena, counsel associated with Kirton McConkie appeared and submitted objections or motions seeking to prevent the subpoenaed testimony.

Plaintiffs allege that this response is notable because:

- The objection was not limited to traditional protections applicable to judicial officers
- But was instead advanced through private counsel connected to Defendants in this matter

This created the appearance that parties with a direct interest in the outcome of the litigation were participating in efforts to limit the scope of testimony and evidence.

## B. Effect on Access to Evidence

The intervention described above had the effect of:

- Preventing or delaying access to potentially relevant testimony
- Limiting Plaintiffs' ability to develop a complete factual record
- And restricting inquiry into prior proceedings involving overlapping issues

Plaintiffs allege that such limitations are significant, particularly where:

- The underlying claims involve complex interactions between private parties and prior judicial proceedings
- And where access to information is already constrained by the structure of the estate and related entities

## C. Use of Legal Resources to Shape the Record

Plaintiffs further allege that Defendants, through their counsel, have consistently:

30

- Opposed discovery efforts
- Challenged subpoenas directed to third parties
- And sought to narrow the scope of inquiry

While such actions may occur within the bounds of litigation, Plaintiffs allege that, taken together, they reflect a broader effort to:

- Control the flow of information
- Limit transparency
- And shape the evidentiary record in a manner favorable to Defendants

## D. Concerns Regarding Overlapping Roles

The involvement of counsel connected to Defendants in matters affecting third-party testimony raises additional concerns regarding:

- The scope of representation
- The alignment of interests among parties
- And the potential for overlapping roles to influence proceedings

Plaintiffs do not assert that such involvement is per se improper in every instance. However, in the context of the broader pattern alleged in this Complaint, it contributes to a perception that:

- Defendants' influence extends beyond the administration of the estate
- And into the procedural mechanisms through which disputes are adjudicated

## E. Cumulative Effect on Judicial Process

Taken together, the actions described herein have had a cumulative effect of:

- Increasing the difficulty of obtaining testimony and evidence
- Extending the duration and complexity of proceedings
- And limiting Plaintiffs' ability to fully present their claims

Plaintiffs allege that this cumulative effect is not incidental. Rather, it is consistent with a broader pattern of:

- Resistance to disclosure
- Restriction of access
- And strategic use of legal process to maintain control

## VIII. THE TIES TO THE LDS CHURCH AND THE SYSTEMIC FAILURE TO ENFORCE ACCOUNTABILITY

This matter cannot be viewed in isolation from the institutional structure and influence of the entities involved. At the center of this case is the law firm Kirton McConkie, which operates not merely as an independent legal entity, but as longstanding legal counsel to The Corporation of the President of The Church of Jesus Christ of Latter-day Saints (the "LDS Church"), one of the most financially powerful and globally recognized religious organizations in the world. Plaintiffs allege the undeniable ties to the LDS Church are the underlying reason the judicial system refuses to prosecute known felons.

Upon information and belief, Kirton McConkie's actions, including those alleged herein, were undertaken within the course and scope of its representation of Church-affiliated interests and for the benefit of those interests. As such, principles of **vicarious liability**, **respondeat superior**, and **corporate liability** apply. Under these doctrines, an organization is responsible for the acts of its agents when those acts are performed within the scope of their employment or authority.

Here, the conduct of Kirton McConkie attorneys—including the administration, control, and refusal to account for trust assets—was not undertaken in a vacuum. It was performed under the authority, direction, and institutional framework of entities that stand to benefit from the preservation of those assets and the suppression of scrutiny. The LDS Church, through its integrated legal and corporate structure, cannot disclaim responsibility where its designated legal arm acts in furtherance of its financial and institutional interests.

Further, **Defendant Dallin H. Oaks**, a senior ecclesiastical leader of the LDS Church and a former legal professional with extensive experience in estate and fiduciary matters, has been named in prior complaints involving substantially similar allegations. Despite his position of authority, expertise, and oversight, no court has required a substantive response from him on the merits. Instead, such actions have consistently been dismissed, quashed, or procedurally terminated without evidentiary hearing, often accompanied by characterizations of Plaintiffs as "vexatious" or findings of purported service defects. The repeated avoidance of adjudication on the merits raises serious concerns regarding access to justice and equal application of the law.

32

The origins of this relationship trace back to approximately 2012–2013, when Plaintiffs' parents, Max and Joyce Eliason, were introduced to Kirton McConkie in a manner that, upon information and belief, intertwined legal services with religious trust and authority. Plaintiffs allege that this introduction was not merely transactional, but was presented in a manner invoking religious credibility and institutional protection—effectively positioning the law firm as an extension of the Church's moral and fiduciary assurances.

In this context, religion functioned not only as a matter of faith, but as a **mechanism of trust acquisition**, inducing vulnerable individuals to entrust substantial estates under the belief that they were being safeguarded by a divinely guided institution. The use of such influence, if proven, raises profound legal and public policy concerns, particularly where it intersects with fiduciary obligations to elderly individuals and their heirs.

The implications of this structure extend beyond private dispute. They raise the question of whether institutional influence and the magnitude of potential liability—financial, reputational, and systemic—have contributed to a pattern in which claims of this nature are not permitted to proceed to full adjudication. Plaintiffs do not assert conclusions regarding the motivations of any governmental entity; however, the observable pattern of non-enforcement, coupled with the scale of the interests involved, presents a matter of significant public concern.

At its core, this case presents a stark and narrow issue: whether entities entrusted with the management of a substantial estate may refuse, for years, to provide even the most basic statutory accounting, while simultaneously exercising control over those assets and engaging in conduct alleged to be retaliatory. The involvement of a major religious institution does not diminish this obligation. If anything, it heightens the expectation that fiduciary duties be performed with the utmost transparency and integrity.

The question before this Court is not whether a religious institution should be scrutinized, but whether **any institution—regardless of size, influence, or public standing—is above the law**.

## IX. VIOLATIONS OF FUNDAMENTAL HUMAN RIGHTS PRINCIPLES AND ABUSE OF POWER UNDER UNITED NATIONS RESOLUTION 40/34

This case does not merely implicate violations of state and federal law; it reflects conduct that falls squarely within internationally recognized definitions of **abuse of power** as articulated by the United Nations. United Nations General Assembly Resolution 40/34, titled the *Declaration of Basic Principles of Justice for Victims of Crime and Abuse of Power*, defines victims of abuse of power as individuals who have suffered harm through acts or omissions that violate internationally recognized norms relating to human rights, even where such conduct may not yet be codified as criminal under domestic law.

The Declaration further provides that victims of abuse of power are entitled to:

- Access to justice and fair treatment
- Restitution and restoration of property or rights
- Protection from intimidation and retaliation
- Assistance throughout legal proceedings

The facts presented in this Complaint align directly with these principles. Plaintiff has alleged and provided evidence that Defendants, acting under color of legal authority, engaged in a coordinated scheme to:

- Remove a lawful Trustee without consent or due process
- Execute unauthorized legal documents depriving individuals of their rights
- Conceal material information relating to estate assets and administration
- Concentrate control of a substantial estate in the hands of a single beneficiary
- Retaliate against Plaintiff through financial deprivation and exclusion from the legal process

More troubling still is the systemic failure that followed. Despite repeated attempts to obtain judicial review, accounting, and basic procedural protections, Plaintiff has been denied meaningful access to justice. Courts have declined to intervene, compel disclosures, or adjudicate the merits of the underlying claims, while Defendants continue to exercise control over the estate and its assets. This pattern of conduct is precisely what Resolution 40/34 was

34

designed to address: situations in which individuals are harmed not only by private actors, but by the **failure of institutions to prevent, remedy, or even acknowledge that harm**.

The Declaration makes clear that victims must be protected from further harm, including intimidation or retaliation. Yet here, Plaintiff's financial lifeline has been severed, his legal standing obstructed, and his efforts to obtain relief repeatedly frustrated—creating a condition of ongoing vulnerability rather than protection. The question therefore becomes unavoidable: **What is the purpose of internationally recognized principles protecting victims of abuse of power if they are not applied when the abuse occurs within powerful institutions, shielded by legal and governmental inaction?**

The United States is a signatory to the principles embodied in Resolution 40/34 and has long positioned itself as a global advocate for justice, transparency, and the rule of law. However, the failure to apply these same principles domestically—particularly in cases involving influential institutions—raises profound concerns regarding equal protection, accountability, and the integrity of the legal system.

This case presents not only a legal dispute, but a test of whether the protections promised to victims of abuse of power have real meaning, or whether they exist merely as aspirational statements without enforcement.

---

## X. PARTIES

### Plaintiffs

### 1. Plaintiff Brett L. Eliason

Plaintiff Brett L. Eliason ("Brett Eliason") is an individual residing in New Jersey. He is a named beneficiary under multiple testamentary instruments and trusts established by Max and Joyce Eliason, including but not limited to the Eliason 2015 Trust, the Eliason 2016 Trust, and the Joyce S. Eliason Trust. Mr. Eliason is also a 33% member of certain related entities, including Eliason Eight, LLC and Eliason Enterprises, LLC.

He was further designated as a trustee under governing trust instruments, prior to actions taken by Defendants and their counsel that interfered with or removed him from that role. Mr. Eliason brings this action individually and as a named Personal Representative under the Last Will and Testament of Joyce Eliason, and as a lawful Trustee

## 2. Plaintiff Véronique Eliason

Plaintiff Véronique Eliason is an individual residing in New Jersey and the spouse of Brett L. Eliason. She has been directly impacted by the financial deprivation, withholding of income, and loss of access to marital assets resulting from Defendants' conduct.

## 3. Plaintiff Kylie M. Eliason

Plaintiff Kylie M. Eliason is an individual residing in New Jersey and a beneficiary of trusts established for the benefit of the Eliason family, including trusts created for grandchildren. She has been denied access to financial information and distributions to which she is entitled.

## 4. Plaintiff Brittnie L. Eliason

Plaintiff Brittnie L. Eliason is an individual residing in New Jersey and a beneficiary of trusts established for the benefit of the Eliason family, including trusts created for grandchildren. She has likewise been denied access to financial information and distributions.

## 5. The Estate of Max and Joyce

Plaintiffs include the Estate of Max Eliason and the Estate of Joyce Eliason, by and through their heirs and interested persons, including Plaintiffs herein. These Estates comprise substantial assets, including real property and oil and gas interests, which have been managed, controlled, or influenced by Defendants. Despite the existence of these Estates and the passage of time since the deaths of Max and Joyce Eliason, no full accounting has been provided to beneficiaries or interested persons.

## DEFENDANTS

### 6. Defendant The United States Department of Justice

Defendant United States Department of Justice is the federal agency responsible for enforcing the laws of the United States. It is charged with protecting constitutional rights and ensuring that justice is administered fairly and impartially. Defendant possesses the authority to investigate violations of federal law and to initiate enforcement actions. Despite such authority, Defendant has failed to act upon substantial allegations and unchallenged evidence presented by Plaintiffs.

### 7. Defendant The Corporation of the President of The Church of Jesus Christ of Latter-day Saints

Defendant The Corporation of the President of The Church of Jesus Christ of Latter-day Saints ("the Church") is a Utah corporation with significant national and international operations. The Church, through its agents and affiliated entities, exercised control and influence over the administration of the trusts and related entities at issue.

### 7. Defendant Dallin H Oaks, President of the Church of Jesus Christ of Latter-Day-Saints

Defendant Dallin H Oaks is not a passive participant in this matter. He is an attorney with a specialization in Estate Planning and has served as a judge on the Utah Supreme Court. He has been named as a Defendant on multiple occasions, and was served with this matter as early as March of 2019 when he was serving as a member of the Board of Directors of the law firm of Kirton McConkie. It was he who dedicated the office space of this law firm in an LDS style temple ceremony in February of 2012, and stated publicly that these were "the lawyers of Jesus Christ Himself.

### 8. Defendant Kirton McConkie

Defendant Kirton McConkie is a law firm organized under the laws of Utah and serves as legal counsel to the Church and related entities. Kirton McConkie, through its attorneys, including Craig McCullough, has acted in connection with the trusts and entities at issue and has participated in the conduct alleged herein.

37

### 9. Defendant Bryan Stephens

Defendant Bryan Stephens is an individual and acting CPA who, upon information and belief, has exercised control or influence over certain trusts and entities at issue and has participated in decisions affecting distributions and financial disclosures.

### 10. Defendant Lisa Stephens

Defendant Lisa Stephens is an individual who, upon information and belief, has acted in a fiduciary or controlling capacity with respect to the trusts and/or entities at issue. She has failed to provide required accounting and has participated in the withholding of financial information and distributions.

### 11. Defendant Craig McCullough

Defendant Craig McCullough is an attorney affiliated with Kirton McConkie who has acted in connection with the trusts and entities at issue, including actions affecting the role of trustees and the control of trust administration. He is accused of orchestrating this crime from the beginning introduction to Max and Joyce Eliason in May of 2013.

### 12. Defendant Eliason Eight, LLC

Defendant **Eliason Eight, LLC** ("Eliason Eight") is a limited liability company organized under the laws of the State of Utah and is believed to own, manage, and/or control substantial income-producing assets, including but not limited to oil, gas, and mineral interests. Eliason Eight is a necessary party to this action pursuant to applicable rules of civil procedure because it is the entity through which the assets and distributions at issue in this case are held, controlled, and administered. Plaintiff holds a lawful ownership and beneficial interest in Eliason Eight and is entitled to, transparency regarding its operations, distributions, and financial condition, including statutory and fiduciary accounting.

### 13. Defendant Eliason Enterprises, LLC

Defendant **Eliason Enterprises** ("Eliason Enterprises") is a limited liability company organized under the laws of the State of Utah and is believed to own, manage, and/or control substantial rental properties. Eliason Eight is a necessary party to this action pursuant to

38

applicable rules of civil procedure because it is the entity through which the assets and distributions at issue in this case are held, controlled, and administered. Plaintiff holds a lawful ownership and beneficial interest in Eliason Eight and is entitled to, transparency regarding its operations, distributions, and financial condition, including statutory and fiduciary accounting.

### 14. Doe Defendants 1–50

Defendants Does 1 through 50 are individuals or entities whose identities are presently unknown but who participated in or contributed to the conduct alleged herein. Plaintiffs will amend this Complaint to include such parties as they are identified.

---

## SECTION XI — JURISDICTION AND VENUE

### A. Subject-Matter Jurisdiction

1. **Federal Question Jurisdiction (28 U.S.C. §1331).**
   This Court has jurisdiction over this action because the claims arise under the laws of the United States, including:
   - 18 U.S.C. §§1961–1968 (Civil RICO),
   - 42 U.S.C. §1983 (deprivation of rights under color of law),
   - 42 U.S.C. §1985(2)–(3) (conspiracy to intimidate or retaliate against a party or witness),
   - Jurisdiction is further proper under **28 U.S.C. § 1361** as Plaintiffs seek to compel Defendants to perform duties owed under federal law.
   - Constitutional violations under the First, Fifth, and Fourteenth Amendments.
   - Plaintiffs also seek declaratory relief under **28 U.S.C. §§ 2201–2202**.

2. **Civil RICO Jurisdiction (18 U.S.C. §1964(c)).**
   This Court has jurisdiction because Plaintiff alleges a pattern of racketeering activity involving mail fraud, wire fraud, obstruction of justice, witness retaliation, financial concealment, and coordinated deprivation of access to the courts. Such acts fall squarely within the statutory scope of federal RICO jurisdiction.

3. **Supplemental Jurisdiction (28 U.S.C. §1367).**
   To the extent any claims arise under state law — including fiduciary breach, fraud, conversion, concealment of trust assets, and abuse of process — this Court has supplemental jurisdiction because those claims form part of the same case or controversy as the federal claims.

## B. Personal Jurisdiction

4. **Defendants' Contacts with the Forum.**
   This Court has personal jurisdiction over Defendants because they have engaged in conduct directed at Plaintiff and affecting Plaintiff's property and financial interests within this District.

   Defendants' actions have had continuing effects on Plaintiff, including deprivation of access to financial distributions, ownership rights, and information relating to the assets at issue.

5. **Constitutional Due Process Requirements Are Satisfied.**
   Defendants' continuous and systematic activities within the State of Utah subject them to this Court's personal jurisdiction. Their acts were neither isolated nor incidental; they were intentional, coordinated, and essential to the enterprise alleged herein.

## C. Venue

6. **Venue is Proper (28 U.S.C. § 1391(b)).**
   Venue is proper in this District because a substantial part of the events or omissions giving rise to the claims occurred within this District, and because the effects of Defendants' conduct are experienced by Plaintiff within this District.

These include:

- the ongoing deprivation of Plaintiff's economic interests;
- the inability to access financial information and records; and
- the continued impact of Defendants' actions on Plaintiff's ownership rights.

7. **Venue is Proper Under 28 U.S.C. §1391(b).**
   Venue lies in this District because:
   - a substantial part of the events giving rise to the claims occurred here,
   - the estate and trust assets were administered, concealed, or misappropriated within this District,
   - key Defendants reside or operate within this District,
   - and the retaliatory lawsuits filed against Plaintiff originated in this District.

8. **Interstate Nature of the Dispute.**
   The assets at issue involve multi-state oil and gas interests and revenue streams transmitted across state lines. The conduct described herein involves interstate communications, financial transfers, and coordinated actions affecting property and contractual rights beyond a single jurisdiction, supporting venue in this District.

9. Venue additionally aligns with **§1965(a)** (RICO venue), allowing suit in any district where **one Defendant resides, is found, has an agent, or transacts business** — all of which apply here.

40

### D. This Court's Authority to Grant the Requested Relief

9.  This Court possesses full authority to:
    o   issue damages under 18 U.S.C. §1964(c),
    o   issue injunctive relief and declaratory relief,
    o   invalidate state-court orders entered through fraud, bias, or due-process violations,
    o   compel discovery and accounting related to the Estate of Max and Joyce Eliason,
    o   consolidate the removed actions with Plaintiff's existing federal case,
    o   and grant all remedies necessary to restore the Plaintiffs' rights.

10. Because Defendants' misconduct directly undermined the integrity of both state and federal proceedings, the federal judiciary has not only jurisdiction but *the obligation* to intervene.

---

## XII. COMMERCIAL NATURE OF ELIASON EIGHT, LLC AND UNLAWFUL SEIZURE OF CONTROL

This action is not limited to a dispute over inheritance. At its core, it concerns the control and operation of a revenue-generating commercial enterprise—**Eliason Eight, LLC**—and the unlawful restructuring of that entity in violation of its governing agreements.

### A. ELIASON EIGHT, LLC AS A COMMERCIAL ENTERPRISE

Eliason Eight, LLC was not a passive inheritance vehicle. It is an operating entity holding substantial oil and gas mineral interests across multiple states, generating continuous revenue through production, leasing, and related commercial activity. These assets constitute the primary source of income associated with the broader Eliason estate.

### B. PLAINTIFF'S ACQUISITION OF OWNERSHIP THROUGH PURCHASE

Plaintiff did not acquire his interest in Eliason Eight, LLC through gratuitous transfer. Rather, Plaintiff, together with related parties, entered into a formal transaction to purchase interests from Max D. Eliason and Joyce S. Eliason. This transaction was supported by:

*   a Promissory Note in excess of $4,000,000; and
*   a personal financial guarantee executed by Plaintiff.

41

Accordingly, Plaintiff's ownership interest arises from a **commercial purchase transaction**, not discretionary inheritance.

## C. GOVERNING CONTRACTUAL STRUCTURE

The operation and control of Eliason Eight, LLC is governed by formal organizational documents, including:

- the original Operating Agreement;
- subsequent amendments; and
- related corporate filings.

These documents establish:
- defined ownership interests;
- management authority; and
- procedures required for valid corporate action.

Critically, the governing structure required coordinated action among managers and, in later amendments, **unanimous consent** for material decisions affecting the entity.

## D. REQUIREMENT OF UNANIMOUS CONSENT

As reflected in the operative governing documents, including the December 2017 amendment, material actions affecting the company required the participation and consent of all managers.

This structure was designed to ensure:
- shared governance;
- protection of minority ownership interests; and
- prevention of unilateral control.

## E. UNAUTHORIZED AMENDMENTS AND REMOVAL OF PLAINTIFF

Despite these requirements, subsequent filings and actions:

- removed Plaintiff from management roles;
- altered authority structures; and
- reassigned control to aligned individuals;

without Plaintiff's consent and in direct contradiction of the governing agreements. These actions were not administrative in nature. They were **structural changes affecting control of the company and its revenue-generating assets**.

## F. LEGAL EFFECT OF UNAUTHORIZED ACTIONS

Because the governing documents required unanimous consent, any amendments, removals, or structural changes undertaken without such consent are:

- void;
- unenforceable; and
- without legal effect.

As a result, the original governing structure remains operative.

## G. TARGETING OF REVENUE-GENERATING ASSETS

The actions described herein were not directed at passive inheritance interests. They were directed at **the entity through which income was generated**.

By altering control of Eliason Eight, LLC, Defendants obtained:

- operational authority over oil and gas assets;
- control of revenue streams; and
- the ability to direct distributions without oversight.

## H. EXCLUSION OF PLAINTIFF FROM COMMERCIAL BENEFITS

Following these actions, Plaintiff was:

- excluded from management participation;
- denied access to company records; and
- deprived of distributions associated with his ownership interest.

This occurred despite Plaintiff:

- holding a valid ownership interest; and
- having acquired that interest through a substantial financial transaction.

## I. CORE COMMERCIAL DISPUTE

The central issue presented is not merely one of inheritance. It is whether a commercial entity governed by contractual agreements may be:

- restructured without required consent;
- used to redirect substantial revenue streams; and
- operated to the exclusion of a lawful owner

in direct violation of its governing documents.

43

## XIII. FACTUAL BACKGROUND

### A. Formation of Relationship and Entrustment of Estate Assets (2013)

**11.** In or about May 2013, Max D. Eliason and Joyce S. Eliason (the "Settlors") sought legal counsel for estate planning purposes following Joyce Eliason's diagnosis of a terminal illness.

**12.** At that time, the Settlors were introduced to Defendant Craig McCullough, a senior partner at Defendant Kirton McConkie, P.C., a law firm affiliated with The Church of Jesus Christ of Latter-day Saints.

**13.** The introduction was made under the representation that Kirton McConkie and Mr. McCullough would act as trusted legal advisors for the Settlors and would structure and administer their estate plan in accordance with their wishes and best interests.

**14.** Relying on these representations, the Settlors entrusted Defendants with control, structuring, and administration of a substantial estate consisting of, among other assets:

   **a.** oil and gas interests located in multiple states, including Utah, Texas, Colorado, and Wyoming;
   **b.** real property holdings;
   **c.** closely held business entities, including limited liability companies; and
   **d.** associated trust structures created for estate planning and asset management purposes.

**15.** The estate entrusted to Defendants had an estimated value in excess of $250,000,000 and represented the entirety of the Settlors' lifetime accumulation of wealth and assets.

**16.** At the time of this engagement, the Settlors' intent regarding distribution of their estate was straightforward and documented:

   **a.** that their assets be distributed equally among their three children; and
   **b.** that the estate be administered in a manner consistent with fiduciary duties owed to all beneficiaries.

### B. Development and Manipulation of Trust Structure (2015–2018)

**17.** Following the initial entrustment of estate planning authority in 2013, Defendants participated in the creation and modification of multiple trust instruments, including but not limited to the Eliason 2015 Trust and subsequent amendments.

**18.** These trust structures were presented to the Settlors as standard estate planning tools designed to ensure orderly administration and equal distribution among beneficiaries.

**19.** Upon information and belief, the structure of these trusts created the appearance of shared control among family members, while embedding provisions that enabled later unilateral control over financial decisions.

44

**20.** The trust instruments distinguished between medical decision-making authority and financial control, creating separate roles that, at the time of execution, appeared balanced and appropriate.

**21.** In practice, this division of authority allowed for the concentration of financial control in the hands of specific individuals, while other parties were directed toward responsibilities unrelated to asset management.

**22.** These structural elements remained dormant until a triggering event occurred, specifically the illness and subsequent decline of Joyce S. Eliason, which activated the operative provisions of the trust.

**23.** At or near the time of this triggering event, Defendants began exercising increased control over trust administration and decision-making authority.

**24.** Plaintiff alleges that, during this period, actions were taken to alter or reinterpret the governing trust structure, including:

   **a.** modification of roles and authority among trustees and fiduciaries;
   **b.** exclusion of certain beneficiaries from information and participation;
   **c.** restriction of access to trust documents and financial records.

**25.** Plaintiff further alleges that, during this same period, Max D. Eliason—the designated successor Trustee—was subjected to proceedings or representations resulting in his classification as legally incompetent.

**26.** The effect of this classification was to remove or diminish his authority over trust administration and financial decision-making.

**27.** Following this removal of authority, Defendants and affiliated individuals exercised control over the trust and related assets without meaningful oversight or participation by Plaintiff.

**28.** Plaintiff further alleges that trust documents were subsequently modified, supplemented, or reinterpreted in a manner that:

   **a.** altered the intended distribution of assets;
   **b.** consolidated control among a limited group of individuals; and
   **c.** excluded Plaintiff from both decision-making authority and financial benefit.

**29.** During this period, Defendants failed to provide timely access to trust documents, withholding such materials for an extended period following the death of Joyce S. Eliason.

**42.** As a result, Plaintiff was unable to evaluate or challenge the changes made to the trust structure in real time.

45

**43.** The sequence of events described herein reflects a consistent pattern in which:

    **a.** authority was initially distributed in appearance;
    **b.** control mechanisms were embedded within the trust structure;
    **c.** a triggering event activated those mechanisms; and
    **d.** control was subsequently consolidated while transparency was reduced.

**44.** This pattern aligns with a recognized framework of estate manipulation in which:

    **a.** decision-making authority is shifted during periods of vulnerability;
    **b.** governing documents are modified or reinterpreted; and
    **c.** intended beneficiaries are excluded from both information and control.

**45.** Plaintiff alleges that Defendants' conduct was not incidental, but rather part of a coordinated course of action designed to obtain and maintain control over estate assets to the exclusion of other beneficiaries.

**46.** The actions described in this section form a critical component of the broader scheme alleged in this Complaint and directly relate to the subsequent denial of accounting, distributions, and fiduciary transparency.

## C. Early Misrepresentations Regarding Representation and Fiduciary Alignment (2013–2015)

**47.** During the early stages of Defendants' involvement in the Eliason estate, representations were made regarding the scope and nature of legal relationships among the parties involved.

**48.** Plaintiff alleges that, in or around this period, communications were made by Bryan Stephens indicating or implying that Defendant Craig McCullough had represented or was associated with representation of Plaintiff's uncle, Larry Stillman, in matters related to estate or financial affairs.

**49.** These representations were material, as they contributed to the perception that Defendant McCullough possessed established familiarity, trust, and alignment with extended family interests.

**50.** Plaintiff relied upon these representations in forming an understanding of Defendants' role as neutral or family-aligned advisors acting in the best interests of the Settlors and their heirs.

**51.** Upon information and belief, such representations were inaccurate.

**52.** Plaintiff further alleges that Defendant Craig McCullough later admitted in written correspondence, dated in or around 2019, that he did not, in fact, know or have a prior professional relationship with Plaintiff's uncle.

53. This admission directly contradicts the earlier representations and inferences communicated to Plaintiff and his family.

54. The inconsistency between:

   a. the initial representations regarding prior relationships; and
   b. the later written admission denying such relationships;

establishes that material information was either misstated or misrepresented at the time of engagement.

55. Plaintiff alleges that these misrepresentations were not incidental, but were made in a manner reasonably calculated to:

   a. create trust and confidence in Defendants;
   b. reduce scrutiny of Defendants' role in structuring the estate; and
   c. induce reliance by the Settlors and beneficiaries.

56. The existence of such misrepresentations is significant because the formation of the attorney-client and fiduciary relationship depends upon full and accurate disclosure of material facts, including prior relationships and potential conflicts.

57. Plaintiff alleges that, had accurate information been disclosed at the time, the Settlors and beneficiaries may have:

   a. sought independent counsel;
   b. questioned the structure of the proposed trust arrangements; or
   c. declined to entrust Defendants with control over estate planning and administration.

58. The misrepresentation of prior relationships and affiliations constitutes a basis for claims including, but not limited to, fraudulent misrepresentation and inducement.

59. As a result of such misrepresentations, any agreements, trust instruments, or fiduciary arrangements entered into in reliance upon those representations are subject to rescission or other equitable relief.

60. Plaintiff attaches as **EXHIBIT H** the correspondence from Bryan Stephens reflecting the representations and inferences described herein.

61. Plaintiff further reserves the right to supplement the record with additional correspondence, including Defendant McCullough's subsequent written admission contradicting such representations.

62. The conduct described in this section represents the earliest identifiable instance in which Defendants' representations to Plaintiff and his family were inconsistent with later admissions,

47

establishing a pattern of misrepresentation that continued throughout the administration of the estate.

## D. Undisclosed Conflict of Interest and Admission by Defendants (2019)

**63.** In February 2019, following the death of Joyce S. Eliason, Plaintiff sought clarification regarding the role and representation of Defendants in connection with the estate and trust administration.

**64.** As a result of these inquiries, Plaintiff participated in a meeting with representatives of Defendant Kirton McConkie, including Thomas A. Mecham, a senior partner of the firm.

**65.** During or immediately following this meeting, Plaintiff received written correspondence from Mr. Mecham dated February 23, 2019.

**66.** In that correspondence, Mr. Mecham stated unequivocally that:

　**a.** Kirton McConkie did not represent Plaintiff; and
　**b.** the firm represented Plaintiff's sister, Lisa Stephens, in her capacity as personal representative of Joyce S. Eliason's estate and trustee of her trust.

**67.** Mr. Mecham further stated that all communications regarding the estate would be handled through Defendant Craig McCullough, who had authority to act on behalf of the firm.

**68.** This written admission directly establishes that Defendants were acting in a representative capacity for Lisa Stephens individually and in her fiduciary roles.

**69.** At the same time, the governing trust documents prepared by Defendants expressly state that Kirton McConkie and Craig McCullough represented Max and Joyce Eliason as Settlors and fiduciaries of the trust.

**70.** The coexistence of these two positions—namely:

　**a.** representation of the Settlors and trust; and
　**b.** representation of an individual beneficiary with competing interests;

constitutes an undisclosed and impermissible conflict of interest under well-established principles of fiduciary duty and professional responsibility.

**71.** Plaintiff alleges that this conflict was not disclosed to the Settlors at the time of engagement, nor at any time during the creation or administration of the trust structures.

**72.** Plaintiff further alleges that this conflict existed from the inception of Defendants' involvement in 2013 and continued through the administration of the estate.

**73.** The significance of this admission is not limited to a technical ethical violation.

**74.** Rather, it establishes that Defendants were operating under divided loyalties while exercising control over estate planning, trust administration, and asset distribution.

**75.** Such conduct is incompatible with the duties of loyalty, candor, and impartiality owed to the Settlors and beneficiaries.

**76.** Plaintiff alleges that any actions taken by Defendants under these conditions—including the preparation of trust documents, amendments, and administration decisions—are subject to challenge, invalidation, or rescission.

**77.** The conflict identified herein directly relates to the subsequent exclusion of Plaintiff from trust administration, denial of information, and alteration of expected distributions.

**78.** Plaintiff attaches the February 23, 2019 correspondence from Thomas A. Mecham as **EXHIBIT I**, which reflects the admissions described in this section.

**79.** This admission, when considered in conjunction with:

   **a.** the trust documents identifying Defendants as counsel for the Settlors; and
   **b.** Defendants' subsequent conduct in administering the estate;

establishes a foundational inconsistency that permeates all aspects of Defendants' involvement in this matter.

**80.** The existence of this conflict presents a binary legal question:

   **a.** If Defendants represented the Settlors, their simultaneous representation of a beneficiary was impermissible; or
   **b.** if Defendants did not represent the Settlors, the trust documents prepared under that premise are materially misleading and invalid.

**81.** Under either scenario, Defendants' conduct cannot be reconciled with their professional obligations or the lawful administration of the estate.

**82.** Plaintiff alleges that Defendants have failed and continue to fail to resolve or explain this conflict, despite repeated opportunities to do so.

## E. Systematic Manipulation of Trust and Corporate Control Documents

**83.** Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

**84.** Following the events described above, Plaintiff conducted a comprehensive review of the governing trust and corporate documents associated with the Eliason estate and related entities.

**85.** That review reveals a consistent pattern of amendments, removals, and restructuring actions that progressively concentrated control in the hands of Lisa Stephens and individuals aligned with her interests.

**86.** The First Amendment to the 2016 Eliason Trust, dated December 8, 2017, expressly provides that:

"When more than one Trustee is serving, the unanimous consent of all then serving Trustees… shall be required to make any decision, undertake any action, or execute any document affecting the Trust."

**87.** This provision required the consent of all co-trustees, including Plaintiff, for any valid trust action.

**88.** Plaintiff attaches this document as **Exhibit J**.

**89.** Despite this explicit requirement, Plaintiff was subsequently removed as a co-trustee by Craig F. McCullough acting as "Trust Protector."

**90.** The removal document, dated May 2019, purports to remove Plaintiff without unanimous trustee consent.

**91.** This action directly contradicts the governing provision requiring unanimity.

**92.** Plaintiff attaches this removal document as **Exhibit K**.

## F. Parallel Violations in Corporate Governance

(Eliason Enterprises, LLC and Eliason Eight, LLC)**

**93.** The same unanimity structure existed within Eliason Enterprises, LLC, and Eliason Eight, LLC.

**94.** As reflected in the Amended and Restated Certificate of Organization dated December 2017, the companies required coordinated action among managers, including Plaintiff.

**95.** Subsequent filings, however, altered management structure and authority without Plaintiff's participation or consent.

**96.** For example, later amendments reflect removal and replacement of managers, including the removal of Laurie Eliason and installation of Jason Stephens, without adherence to the original governance structure.

**97.** These documents demonstrate that:

- control shifted incrementally;
- decision-making authority was consolidated; and
- Plaintiff was systematically excluded.

**98.** Plaintiff attaches these corporate governance documents as **Exhibit L–Q**, including:

- Amended and Restated Certificate of Organization (Dec. 2017);
- Statement of Authority (Dec. 2017); and
- Subsequent Amendments and Resolutions (2019–2020).

**99.** The documents referenced above reveal a pattern in which:

**a.** governance rules were initially structured to require shared control;
**b.** Plaintiff was later removed without compliance with those rules; and
**c.** replacement individuals were installed to ensure aligned decision-making.

**100.** This pattern is consistent across both:

- trust administration; and
- corporate entity governance.

**101.** The effect of these actions was to eliminate Plaintiff from any meaningful role in decision-making while maintaining the appearance of formal compliance.

## G. Withholding of Critical Trust Documents

**102.** Despite repeated requests, Defendants have refused to produce key governing documents, including:

- the First Amendment to the 2016 Trust (dated December 7, 2017);
- the Max D. Eliason Trust (A/B Trust structure);
- the Marital Trust; and
- additional sub-trusts referenced in estate planning documents.

**103.** Plaintiff has personal knowledge that at least one withheld amendment exists and was executed by Max D. Eliason as co-trustee and co-settlor.

**104.** The refusal to produce this document supports a reasonable inference that:

**a.** Max D. Eliason was competent at the time of execution; and
**b.** subsequent actions taken without his consent were inconsistent with governing authority.

## H. Additional Foundational Trust Documents

**105.** Plaintiff further identifies the following foundational documents, which establish the original intent and structure of the estate:

- Joyce Eliason Trust (October 28, 2015);
- Second Amendment (April 17, 2018);
- Third Amendment (May 4, 2018);
- Eliason Family 2015 Trust (December 30, 2015); and
- Eliason 2016 Trust (December 22, 2016).

**106.** Plaintiff attaches these documents as **Exhibits R through V**, to the extent available.

## I. Legal Effect of Established Conflict of Interest

**107.** As set forth in Section D, Defendants operated under an undisclosed and impermissible conflict of interest while preparing and administering these documents.

**108.** As a result, any documents prepared, amended, or executed under such conflict are subject to:

- invalidation;
- rescission; or
- heightened judicial scrutiny.

**109.** The question is therefore not merely whether these documents exist, but whether they were lawfully created or strategically engineered to consolidate control.

## J. Central Allegation

**110.** Plaintiff alleges that the amendments and governance changes described herein were not neutral administrative actions.

**111.** Rather, they were part of a coordinated effort to:

- remove Plaintiff from positions of authority;
- consolidate control among aligned parties; and
- facilitate the diversion and control of estate assets.

---

## XIV. TARGETED AMENDMENTS DESIGNED TO REMOVE LAWFUL AUTHORITY AND CONSOLIDATE CONTROL

**112.** Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

**113.** The original Joyce S. Eliason Trust, dated October 28, 2015, clearly identifies Max D. Eliason as both:

- Co-Settlor; and
- Co-Trustee;

and further establishes him as a successor trustee.

**114.** This structure required the participation, consent, and authority of Max D. Eliason in all material trust decisions.

**115.** Plaintiff attaches the original trust document as **Exhibit R**.

## A. Second Amendment: Removal of Max Eliason Without Consent

**116.** The Second Amendment to the Joyce S. Eliason Trust, dated April 17, 2018, purports to remove Max D. Eliason from his role as trustee.

**117.** At the time of this amendment:

- Max D. Eliason was still alive;
- no valid consent from him was obtained; and
- no lawful process was followed to remove a co-settlor and co-trustee.

**118.** This amendment fundamentally altered the governance structure of the trust.

**119.** Plaintiff attaches this document as **Exhibit S**.

## B. Third Amendment: Expansion of Control Following Objection

**120.** Shortly after the Second Amendment, a Third Amendment dated May 2018 was executed.

**121.** Plaintiff alleges that this amendment was obtained after Joyce Eliason:

- questioned or objected to the Second Amendment; and
- was induced to sign additional documents that further expanded control by others.

**122.** Plaintiff attaches the Third Amendment as **Exhibit T**.

## C. Creation of the "Grandchildren's Trust" Structure

**123.** The amendment creates an entirely new "Grandchildren's Trust" funded by IRA assets.

**124.** It mandates:

- creation of multiple subtrusts;
- allocation formulas based on age and lineage; and
- strict control over distributions.

**125.** As reflected in the amendment, the Trustee is required to create a separate structure controlling IRA assets and distribute them only under tightly defined conditions.

**126.** This structure:

- redirects significant financial assets;
- removes flexibility from prior trust design; and
- places complete administrative control in the Trustee.

## D. Installation of Lisa Stephens as Sole Controlling Trustee

**127.** The most critical provision appears in Section 6.1 (as amended), which provides that Lisa Eliason Stephens shall serve as Trustee of all subtrusts created under the Grandchildren's Trust.

**128.** This provision effectively grants Lisa Stephens:

- exclusive control over all subtrust assets; and
- authority over distributions affecting multiple generations.

**129.** This clause:

- centralizes control in a single beneficiary;
- bypasses the original co-trustee structure; and
- eliminates any requirement of shared governance.

**130.** Importantly, this authority was granted:

- after Max Eliason had been removed without consent; and
- without lawful authority to override his role as co-settlor.

## E. Absolute Discretion Over Distributions

**131.** The amendment repeatedly grants the Trustee sole discretion over distributions, including:

- timing of payments;
- suspension of payments; and
- allocation of principal and income.

**132.** For example:

- distributions may be accelerated or withheld at the Trustee's discretion;
- funds may be accumulated indefinitely; and
- beneficiaries have no enforceable entitlement beyond minimal structured payments.

**133.** In plain terms, the Trustee controls who gets paid, when they get paid, and whether they get paid at all.

## F. Multi-Generational Control Structure

**134.** The amendment creates a cascading structure of:

- grandchildren's trusts;
- great-grandchildren's trusts; and
- spousal subtrusts.

**135.** These structures ensure that control extends across:

- multiple generations; and
- future descendants.

**136.** However, administration of these trusts remains centralized under Lisa Stephens.

## G. Disproportionate Benefit and Exclusion of Plaintiff

**137.** Plaintiff alleges that these provisions:

- were not designed for neutral estate planning;
- disproportionately benefit Lisa Stephens' control interests; and
- enable her to direct assets toward:

  o her children;
  o her grandchildren; and
  o her lineage.

**138.** At the same time, Plaintiff was:

- removed from governance; and
- excluded from decision-making authority.

## H. Sequential Pattern of Control

**139.** When viewed together, the amendments reveal a deliberate sequence:

**Step 1:** Remove Max Eliason (co-settlor)
**Step 2:** Eliminate Plaintiff from governance
**Step 3:** Rewrite trust structure
**Step 4:** Install Lisa Stephens as sole controlling authority
**Step 5:** Extend that control across generations

## I. Legal Effect of the Amendments

**140.** These amendments were executed:

- under conditions of undisclosed conflict of interest;
- without required consent of governing parties; and
- in contradiction of the original trust structure.

**141.** As such, they are subject to:

- invalidation;
- rescission; and
- judicial review for fraud, undue influence, and self-dealing.

---

# G. Document Integrity Irregularities and Inconsistent Control Numbers

**142.** Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

**143.** The original Joyce S. Eliason Trust, dated October 28, 2015, contains multiple inconsistent document control identifiers ("run numbers") appearing on different pages of the same purported instrument.

## A. Inconsistent Document Identifiers

**144.** Specifically:

- The first page of the Trust reflects the identifier: **4818-7415-5034.1**;
- The signature page executed by Max D. Eliason reflects a different identifier: **4847-0750-7993.1**; and
- Additional pages within the Trust documents reflect yet another identifier: **4825-9726-6788**.

**145.** These identifiers are visible directly on the face of the document and are attached as part of **Exhibit R**.

**146.** Such identifiers are commonly used in legal and financial document systems to:

- track document versions;
- ensure document integrity; and
- prevent substitution or alteration of pages.

**147.** In standard practice, a single executed instrument would reflect consistent identifiers across all pages.

**148.** The presence of multiple inconsistent identifiers within the same purported Trust instrument indicates that:

- the document may not have been maintained as a single unified version;
- pages may have originated from different drafts or compilations; and
- the integrity of the executed document cannot be confirmed from its face.

**149.** These inconsistencies raise serious concerns regarding:

- whether the document signed by Max D. Eliason corresponds to the same version presented as the governing Trust;
- whether pages were substituted, modified, or recompiled; and
- whether the instrument reflects the true intent and agreement of all parties.

**150.** Accordingly, the document, as presented, contains internal inconsistencies that undermine its reliability and warrant judicial scrutiny.

## H. Structural Design of the 2015 Trust Enables Unchecked Control and Asset Diversion (Exhibit U)

**151.** Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

**152.** The Eliason Family 2015 Trust is not a neutral estate planning instrument but a structure that concentrates authority in a manner that permits the redirection of trust assets without meaningful accountability.

**153.** The Trust grants the Trustee authority to distribute "all, none, or any part" of the Trust estate to beneficiaries, effectively eliminating any enforceable right of a beneficiary to receive distributions.

**154.** The Trust further appoints Craig F. McCullough as Trust Protector, granting him unilateral authority to:

- remove and appoint trustees;
- terminate the Trust;
- modify the Trust; and
- override beneficiary rights;

while expressly providing that he acts in a non-fiduciary capacity, with no duty to any beneficiary.

**155.** The Trust Protector is additionally empowered to:

- add new beneficiaries, including charitable entities;
- authorize distributions to such newly created beneficiaries; and
- enable transfers of trust assets outside the original family structure.

**156.** The Trust also permits the Trustee to relocate the Trust to another jurisdiction, including foreign jurisdictions, thereby altering the governing law and reducing oversight.

**157.** The Trust is administered independent of court supervision, and its accounting provisions permit limited disclosure, subject to procedural barriers that can effectively shield misconduct.

**158.** Taken together, these provisions create a structure in which control of the Trust and its assets may be exercised without transparency, without accountability, and without enforceable rights in favor of the beneficiaries.

## I. The 2016 Trust and Amendment Further Entrenched Control and Prevented Oversight

**159.** Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

**160.** The 2016 Eliason Trust, as amended in December 2017, did not reduce or balance the extraordinary powers granted in prior trust instruments, but instead restructured decision-making in a manner that effectively eliminated any ability of a dissenting trustee to act.

**161.** Specifically, the amendment replaced the prior "majority rule" governance structure with a requirement that all actions of the Trust require the unanimous consent of all serving trustees.

**162.** While facially neutral, this provision operates in practice to prevent any trustee from exercising independent authority, particularly where two trustees act in concert against a third.

**163.** Under this structure, a dissenting trustee is rendered functionally powerless, as any effort to:

- demand accounting;
- challenge distributions;
- prevent asset transfers; or
- enforce fiduciary duties;

may be blocked by the refusal of the remaining trustees to consent.

**164.** This amendment therefore transforms the trust into a system where:

- control is consolidated among aligned trustees; and
- oversight by a dissenting trustee is structurally impossible.

**165.** When viewed in conjunction with the broader provisions of the 2016 Trust—including the ability to:

- add or remove beneficiaries;
- declare beneficiaries incapacitated without judicial process;

58

- fund life insurance for the benefit of third parties; and
- relocate trust assets or administration to foreign jurisdictions;

the unanimous consent requirement operates not as a safeguard, but as a mechanism to shield the exercise of those powers from internal challenge.

**166.** Accordingly, the 2016 amendment does not limit authority, but rather ensures that any trustee seeking to expose or prevent misconduct may be effectively silenced through coordinated refusal of consent.

## J. Administration of Morphine, Incapacitation, and Execution of Trust Amendments

**167.** Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

**168.** In the days immediately preceding the execution of the April 17, 2018 amendment to the Joyce S. Eliason Trust, Joyce Eliason was administered morphine under circumstances that raise serious and unresolved questions.

**169.** Contemporaneous text messages reflect that Joyce Eliason was requesting morphine and reporting adverse effects, including symptoms consistent with allergic response and significant physical decline.

**170.** Medical records from Joyce Eliason's treating physician indicate that morphine was not prescribed to her during this period.

**171.** The treating physician further indicated that he would not have prescribed morphine in light of Joyce Eliason's lung condition, as morphine may suppress respiratory function in a patient already experiencing difficulty breathing.

**172.** Notwithstanding the absence of a prescription, morphine was administered to Joyce Eliason in the days immediately preceding the execution of critical estate documents.

**173.** The timing is notable:

  - **April 16, 2018:** Joyce Eliason reports requesting morphine and experiencing adverse effects;
  - **April 17, 2018:** Joyce Eliason executes the Second Amendment to her Trust, which removed her husband and son from positions of control and transferred authority to Lisa Stephens; and
  - **Shortly thereafter:** Joyce Eliason became incoherent and unresponsive.

**174.** Within hours to days of executing these documents, Joyce Eliason entered a state described in medical records and witness accounts as a period of extreme impairment, during which she was unable to communicate or meaningfully understand events.

**175.** During this period, she was unable to communicate or comprehend the circumstances surrounding the documents she had signed.

**176.** When Joyce Eliason later regained consciousness, she expressed confusion regarding the documents and asked what she had signed, referencing a "Diamond Trust," a term not previously known to her or reflected in the disclosed estate planning structure.

**177.** She requested copies of the executed documents from counsel; those requests were not fulfilled at that time.

**178.** The sequence of events presents a concerning pattern:

  • administration of a powerful narcotic without documented prescription;
  • execution of documents transferring control of substantial assets;
  • rapid onset of significant impairment; and
  • subsequent inability of the signatory to confirm or understand those documents.

**179.** These facts support reasonable inferences of:

  • undue influence;
  • exploitation of a vulnerable adult; and
  • impairment of capacity at the time of execution.

**180.** At or around the same time, the governing trust documents referenced life insurance policies on the life of Joyce Eliason, of which she had no known awareness.

**181.** These provisions permitted insurance proceeds to be directed to designated beneficiaries under the control of the acting trustee.

**182.** The combination of:

  • the administration of a respiratory-suppressing narcotic without documented prescription;
  • the transfer of control over the estate; and
  • the subsequent medical collapse of the insured individual;

raises material questions regarding the circumstances surrounding these events.

**183.** At minimum, these facts establish a convergence of financial incentive and medical impairment within a narrow and critical window of time.

**184.** These events did not occur in isolation.

**185.** At the same time Joyce Eliason was receiving medication and executing trust amendments, Max Eliason was experiencing cognitive decline and dementia, limiting his ability to independently review or challenge changes to the estate.

**186.** The combined effect was the simultaneous impairment of both settlors:

• Joyce Eliason during the execution of amendments; and
• Max Eliason with respect to his ability to oversee or object.

**187.** Plaintiff alleges that the execution of trust amendments under these circumstances is consistent with:

• exploitation of a vulnerable adult;
• breach of fiduciary duty; and
• conduct warranting judicial scrutiny.

**188.** These circumstances warrant further review, including:

• verification of medications administered;
• identification of the source of the morphine; and
• a full accounting of individuals present and involved in the execution of the April 17, 2018 documents.

## K. Continuous Financial Transfers Without Accounting or Beneficiary Participation

**189.** Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

**190.** Since the formation of the Eliason Trust structures in 2015 and 2016, substantial funds have flowed into and out of these entities on a continuous basis.

**191.** Despite being a named beneficiary and trustee at relevant times, Plaintiff has not received:

• any formal accounting;
• any Schedule K-1 tax documentation;
• any disclosure identifying recipients of distributions; or
• any explanation of the purpose or authorization of such transfers.

**192.** The limited financial records that have been produced—including a partial ledger from the Eliason 2016 Trust—reflect that significant sums have been transferred without corresponding disclosure.

**193.** For example, the ledger reflects that, within a single period:

• substantial sums were wired to the United States Treasury; and
• numerous transactions were executed across accounts without explanation or beneficiary disclosure.

**194.** Upon information and belief, more than $40,000,000 has flowed through the 2015 and 2016 Trusts alone, yet no corresponding accounting has been provided to Plaintiff.

195. The absence of such disclosures is not incidental; it is systemic.

196. Under basic principles of trust law, a trustee is required to:

- maintain accurate records;
- provide periodic accountings; and
- disclose material financial activity to beneficiaries.

197. The failure to provide such information over multiple years constitutes a breach of fiduciary duty.

198. As set forth above, the governing trust documents were created and modified under circumstances involving:

- undisclosed conflicts of interest;
- removal of co-trustees without lawful authority; and
- structural provisions preventing oversight.

199. As a result, subsequent financial activity conducted under those documents is subject to question as to its validity and authorization.

200. Funds have been transferred, distributed, and expended without:

- beneficiary consent;
- co-trustee approval; or
- adherence to governing trust provisions requiring joint action.

201. These transactions include interstate wire transfers, including payments to third parties and governmental entities, executed without documented authorization or disclosure.

202. To the extent such transfers were conducted through interstate financial systems without lawful authority or proper disclosure, they may constitute improper diversion of trust assets and actionable financial misconduct under applicable law.

203. While substantial sums have flowed through these trust structures, Plaintiff has:

- received no distributions;
- been denied access to financial records; and
- been excluded from participation in the management of assets.

204. This deprivation has occurred despite Plaintiff being:

- an heir to the estate; and
- a named beneficiary under the governing instruments.

205. The combination of:

- undisclosed financial activity;
- absence of accounting;

- structural elimination of oversight; and
- exclusion of a lawful beneficiary;

supports a pattern consistent with concealment and diversion of trust assets.

**206.** These facts warrant judicial intervention, including:

- a full forensic accounting of all trust and LLC activity;
- identification of all recipients of distributions; and
- restoration of Plaintiff's rights as a beneficiary.

---

## L. Waivers and Renunciations Executed Without Independent Representation or Verifiable Consent

**207.** Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

**208.** Following the death of Joyce Eliason in May 2018, Defendants submitted to the Probate Court documents titled *Waiver of Notice and Renunciation of Right to Serve as Personal Representative.*

**209.** These documents purport to show that both:

- Brett Eliason; and
- Max D. Eliason;

waived all rights to serve as personal representative and consented to the appointment of Lisa Stephens.

**210.** Plaintiff attaches these documents as:

- **Exhibit W** – Waiver and Renunciation (Brett Eliason); and
- **Exhibit X** – Waiver and Renunciation (Max D. Eliason).

**211.** Both documents contain the following notation: *"Signed by Craig F. McCullough with permission of [the undersigned]."*

**212.** This statement appears on both:

- the document attributed to Brett Eliason; and
- the document attributed to Max D. Eliason.

**213.** At the time these documents were executed:

- Craig McCullough and Kirton McConkie did not represent Brett Eliason;
- Craig McCullough and Kirton McConkie did not represent Max D. Eliason; and

63

• they had expressly stated they represented Lisa Stephens, whose appointment was the direct subject of these waivers.

**214.** Neither Brett Eliason nor Max D. Eliason was provided independent legal counsel in connection with these waivers.

**215.** The documents were prepared, executed, and submitted by counsel representing an adverse party.

**216.** The execution of such waivers—particularly those relinquishing legal rights—without independent counsel raises substantial concerns regarding:

- informed consent;
- voluntariness; and
- validity of execution.

**217.** At or near the time these documents were executed, Defendants were simultaneously asserting that Max Eliason:

- suffered from advanced cognitive impairment; and
- was incapable of managing his own affairs.

**218.** Despite this position, Defendants submitted a document purporting to reflect his consent to waive substantial legal rights.

**219.** The documents purport to:

- waive notice of all probate proceedings; and
- renounce the right to serve as personal representative.

**220.** These rights are fundamental and directly affect:

- control of estate administration;
- oversight of assets; and
- the ability to challenge actions taken by others.

**221.** The effect of these waivers was to clear the path for Lisa Stephens to assume control of estate administration.

**222.** The documents do not reflect handwritten signatures executed in the presence of a neutral third party.

**223.** Instead, they rely on a representation by opposing counsel that the documents were signed "with permission."

**224.** No independent verification of such permission has been provided.

**225.** These waivers do not stand alone.

**226.** They are part of a broader pattern in which:

- authority was transferred;
- rights were relinquished; and
- control was consolidated;

through documents prepared and executed under circumstances lacking transparency and independent review.

**227.** The execution and submission of these waivers under the circumstances described herein raise substantial questions as to:

- their validity;
- their enforceability; and
- whether they were obtained through improper means, including undue influence or misrepresentation.

**228.** Accordingly, these documents are subject to challenge and potential invalidation.

## M. Interference with Family Relationship, Coercion, and Unauthorized Restrictions on Access to Max Eliason (Exhibits Y–Z)

229.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

230.    Immediately following Defendants' admission of an undisclosed conflict of interest in February 2019, a new attorney, R. David Bishop, appeared and began issuing communications directed at Plaintiff.

231.    These communications included cease-and-desist demands and directives purporting to regulate Plaintiff's contact with his father, Max Eliason.

232.    The timing of this intervention is significant, as it occurred only after Plaintiff began raising concerns regarding Defendants' conduct and fiduciary conflicts.

233.    At no time did any court enter an order restricting Plaintiff's access to his father.

234.    Despite the absence of any judicial directive, Mr. Bishop and others issued written communications:
- dictating the terms under which Plaintiff could see his father;
- threatening consequences for non-compliance; and
- asserting authority over Plaintiff's familial relationship.

235.    The trust documents prepared by Defendants identify Kirton McConkie and Craig McCullough as counsel in matters relating to Max Eliason and the trust.

236.    However, Mr. Bishop appeared without explanation as purported counsel for Max Eliason, raising questions as to:
- who was authorized to represent him;
- whether such representation was obtained with informed consent; and
- whether Max Eliason had the capacity to engage independent counsel at that time.

237.    At the time these restrictions were imposed, Max Eliason was:
- elderly;
- experiencing cognitive decline; and
- dependent on others for care and decision-making.

238.    This condition rendered him particularly vulnerable to influence, control, and isolation.

239.    Plaintiff alleges that Defendants and associated individuals engaged in a pattern of conduct designed to:
- isolate Max Eliason from Plaintiff;
- control the flow of information to and from him; and
- restrict Plaintiff's ability to communicate with or visit his father.

240.    These actions were not based on court order, medical directive, or lawful authority.

241.    Instead, they were enforced through:
- attorney communications;
- threats of legal consequences; and
- unilateral assertions of control.

242.    The cease-and-desist letters issued by Mr. Bishop functioned not as legitimate legal protections, but as instruments of intimidation.

243.    These communications portrayed Plaintiff as:
- a threat;
- a disruptive presence; or
- an individual requiring restriction despite the absence of any judicial finding to that effect.

244.    Plaintiff denies each and every allegation contained in such communications.

245.    The effect of these actions was to:
- deprive Plaintiff of meaningful contact with his father;
- prevent Plaintiff from observing or intervening in his father's care; and
- remove Plaintiff as a potential check against decisions being made regarding the estate and assets.

246.    The conduct described herein is consistent with:
- interference with familial relations;
- exploitation of a vulnerable adult;
- abuse of position of trust; and
- coercive use of legal process for personal gain.

247.   The use of attorneys to impose non-judicial restrictions on a family relationship—particularly in the absence of any court order—constitutes an improper assertion of authority.

248.   As a direct result of these actions, Plaintiff was:
   • separated from his father during critical periods of his life;
   • denied the ability to provide support, oversight, or companionship; and
   • subjected to emotional distress arising from the forced alienation.

249.   The coordinated use of legal threats, unsupported restrictions, and shifting representation created an environment in which:
   • Plaintiff's rights as a son were overridden;
   • Max Eliason's autonomy was compromised; and
   • control over both personal relationships and financial matters was consolidated.

---

## XIV. FABRICATION OF MARITAL STATUS AND INTERFERENCE WITH SPOUSAL RIGHTS (CONTINUED)

250.   Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

### A. Material Importance of Marital Status Within the Trust Structure

251.   Under the governing trust instruments, Plaintiff Brett L. Eliason's marital status was a material legal factor affecting:

   a.   identification of beneficiaries;
   b.   spousal rights to participation and distribution; and
   c.   succession of trustee authority upon incapacity.

252.   The 2016 Trust expressly provided that Plaintiff's spouse, Véronique Eliason, would assume authority as successor trustee in the event Plaintiff was unable to serve.

253.   That same trust further provided that, in the event of divorce or separation, the spouse would be deemed legally deceased for purposes of the trust.

254.   The effect of such provision was to:

   a.   eliminate spousal authority;
   b.   prevent participation in trustee selection; and
   c.   remove the spouse from any role in protecting beneficiary interests.

### B. Actual Marital Status of Plaintiff

255.   At all relevant times, Plaintiff Brett Eliason and Véronique Eliason remained legally married.

256.   Although divorce proceedings were initiated in or around March 2016:

67

a.   Plaintiff never filed a response;
b.   no hearing was conducted;
c.   no judicial determination was made; and
d.   the proceedings terminated without adjudication in or around January 2017.

257.   No valid divorce decree was ever lawfully entered dissolving the marriage.

## C. Discovery of Fabricated Divorce Decree

258.   In or about 2020, Plaintiff discovered a document purporting to be a Decree of Divorce dated April 16, 2016.

259.   The document:

a.   identified Plaintiff and his spouse as divorced;
b.   appeared to bear judicial formatting and authority; and
c.   contained detailed personal and financial information.

 **(See Exhibit AA)**

## D. Unauthorized Access to Personal Information

260.   The divorce decree contained information derived from Plaintiff's private records, including materials not publicly accessible.

261.   Plaintiff discovered that:

a.   individuals with access to his residence had entered his private space;
b.   personal documents, including financial and legal records, had been accessed without authorization; and
c.   additional information contained in the decree was not obtained from physical documents, indicating possible electronic access.

262.   These facts support a reasonable inference of unauthorized access to Plaintiff's personal and confidential information.

## E. Evidence of Coordination Among Defendants and Related Parties

263.   The purported divorce decree was found in the possession of an individual, Zant Doty, who:

a.   resided in Plaintiff's home;
b.   had access to Plaintiff's personal records; and
c.   maintained communications with Bryan Stephens.

264.   Plaintiff identified evidence indicating:

a.   ongoing communication between Zant Doty and Bryan Stephens;
b.   pre-existing relationships between these individuals and Defendant Lisa Stephens;

and

    c.   refusal to disclose full communication history absent subpoena.

265.   These facts support a reasonable inference of coordination among individuals connected to Defendants.

## F. False Representation and Use of Marital Status

266.   Plaintiff alleges that Defendants represented, implied, or treated Plaintiff as divorced despite no lawful basis.

267.   This misrepresentation was used to:

    a.   eliminate Véronique Eliason from trustee succession;
    b.   prevent her from exercising spousal rights; and
    c.   remove her from participation in trust-related decisions.

268.   The mischaracterization of Plaintiff's marital status further enabled Defendants to:

    a.   invoke provisions relating to incapacity;
    b.   justify removal or replacement of authority; and
    c.   reallocate control to aligned individuals.

(See Exhibit BB)

## G. Appointment of Aligned Fiduciaries

269.   Following the alteration or misrepresentation of Plaintiff's marital status, individuals aligned with Defendant Lisa Stephens were placed into positions of authority.

270.   These individuals included, but were not limited to, Defendant Jason Stephens.

271.   Such appointments:

    a.   were not neutral;
    b.   were made without Plaintiff's informed consent; and
    c.   directly benefited Defendants.

## H. Conflict of Interest in Representation

272.   Documentary evidence establishes that Kirton McConkie entered an appearance on behalf of Plaintiff Brett L. Eliason in connection with the divorce matter.

 (See Notice of Appearance, page 6)

273.   At the same time, Defendants and their counsel acted in alignment with parties whose interests were adverse to Plaintiff.

274.   This created a concurrent conflict of interest in which:

a.   legal representation overlapped with adverse interests;
b.   decisions affecting Plaintiff were influenced by divided loyalties; and
c.   no disclosure or waiver of such conflict was provided.

## I. Pattern of Coordinated Exclusion

275.   The fabrication or manipulation of Plaintiff's marital status did not occur in isolation.

276.   Rather, it forms part of a broader pattern including:

a.   removal of Plaintiff from positions of authority;
b.   restriction of access to information;
c.   reassignment of control to aligned individuals; and
d.   suppression of beneficiary rights.

277.   The interference with marital status represents an escalation in that it:

a.   altered Plaintiff's legal identity;
b.   interfered with a lawful marriage without judicial process; and
c.   was used to facilitate control over trust and estate assets.

## J. Resulting Harm

278.   As a direct and proximate result of the conduct described herein, Plaintiffs have suffered:

a.   deprivation of spousal rights;
b.   loss of participation in trust governance;
c.   financial harm; and
d.   emotional and relational harm.

279.   The conduct further constitutes:

a.   fraudulent misrepresentation;
b.   interference with marital relations;
c.   breach of fiduciary duty; and
d.   abuse of legal process.

## XV. TORTIOUS INTERFERENCE WITH ECONOMIC EXPECTATIONS, CONSPIRACY, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (MY 3-D ME)

280.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

### A. Formation of Business and Defendants' Knowledge

281.    In or about 2016, Plaintiff and his mother formed a business known as My 3-D Me, a venture involving proprietary 3-D imaging and printing technology.

282.    Plaintiff and his mother invested substantial time and capital into the business, including approximately $750,000 in development, equipment, and operational expenses.

283.    The business was intended to generate substantial income and represented a primary economic opportunity for Plaintiff and his family.

284.    Defendants were aware of:

   a.   the existence of the business;
   b.   Plaintiff's financial reliance upon it; and
   c.   the anticipated economic benefits associated with its success.

### B. Economic Expectations and Imminent Launch

285.    Plaintiff and his mother secured a commercial lease and prepared to open the business in or about March 2018.

286.    The business was fully operational and capable of generating revenue prior to interference by Defendants and their co-conspirators.

287.    Plaintiff reasonably expected:

   a.   immediate revenue upon opening;
   b.   long-term profitability; and
   c.   recovery of invested capital.

### C. Coordinated Interference and Sabotage

288.    Individuals associated with Defendants, including members of the Bair family, were introduced into the business under the pretense of partnership and cooperation.

289.   These individuals:

   a.   obtained access to proprietary equipment and technology;
   b.   gained access to confidential business operations; and
   c.   positioned themselves as essential to the business's launch.

290.   Defendants, acting individually and in concert with others, knowingly and intentionally interfered with Plaintiff's business by:

   a.   inducing business partners to cease performance;
   b.   facilitating the removal and/or withholding of critical equipment;
   c.   preventing the business from opening as scheduled; and
   d.   sabotaging the operational viability of the enterprise.

291.   As described in Plaintiff's supporting materials, the removal of equipment and cessation of cooperation occurred immediately prior to the scheduled opening, ensuring business failure.

## D. Misappropriation and Parallel Enterprise

292.   Plaintiff discovered that the technology, images, and business model of My 3-D Me were used in a separate enterprise without authorization.

293.   This included:

   a.   use of Plaintiff's proprietary images and outputs;
   b.   replication of the business model; and
   c.   operation of a competing platform utilizing Plaintiff's assets.

294.   The existence of such a parallel enterprise supports a reasonable inference that Defendants' actions were not accidental but intentional and coordinated.

## E. Financial Destruction and Loss of Economic Opportunity

295.   As a direct result of Defendants' conduct, Plaintiff suffered catastrophic financial losses, including but not limited to:

   a.   loss of invested capital exceeding $750,000;
   b.   ongoing lease obligations exceeding $10,000 per month;
   c.   default on credit obligations exceeding $200,000;
   d.   foreclosure of real property; and
   e.   destruction of Plaintiff's credit and financial standing.

296.   Plaintiff further suffered the loss of anticipated income, including business revenue and trust distributions exceeding $1,000,000 per month.

**F. Intentional Infliction of Emotional Distress**

297.   Defendants' conduct was extreme and outrageous in that it:

    a.   targeted Plaintiff during the terminal illness of his mother;
    b.   destroyed a business created as part of her final wishes;
    c.   caused the business to fail before she could see it succeed; and
    d.   inflicted severe emotional trauma during a period of vulnerability.

298.   The conduct described herein was undertaken with knowledge that it would cause severe emotional distress.

299.   Plaintiff suffered:

    a.   severe anxiety and emotional collapse;
    b.   financial and psychological devastation; and
    c.   long-term harm to his personal and family life.

**G. Pattern of Conspiracy and Coordination**

300.   The interference with Plaintiff's business was not an isolated event but part of a broader pattern of conduct, including:

    a.   interference with trust distributions;
    b.   removal of Plaintiff from financial control;

**H. Obstruction of Evidence in Current Defamation Action**

301.   In the current defamation action pending in the State of Utah, Plaintiff issued a subpoena seeking documents and testimony to confirm or refute the allegations described herein, including conduct relating to Lisa Stephens and associated business activities.

302.   Kirton McConkie, acting on behalf of Plaintiffs and/or related parties, blocked or opposed such subpoena.

303.   The obstruction of this discovery:

    a.   prevents Plaintiff from obtaining evidence directly relevant to the truth of his statements;
    b.   interferes with Plaintiff's ability to defend against defamation claims; and
    c.   supports an inference that the requested information would be adverse to Defendants.

304.   The refusal to permit discovery into these matters, while simultaneously asserting claims of defamation, raises substantial questions regarding Defendants' good faith and credibility.

**I. Causation and Damages**

305.    Defendants' conduct was a direct and proximate cause of:

   a.    destruction of Plaintiff's business;
   b.    loss of present and future economic opportunities;
   c.    financial ruin; and
   d.    severe emotional distress.

306.    Plaintiff is entitled to damages in an amount to be proven at trial, including but not limited to compensatory, consequential, and punitive damages.

**J. Judicial Conduct and Denial of Emergency Relief**

307.    Plaintiff sought emergency judicial relief in the State of Utah in connection with the imminent loss of his residence.

308.    On or about February 1, 2024, Plaintiff appeared before Judge Mark Kouris requesting a preliminary injunction to prevent eviction from his home.

309.    Plaintiff informed the Court that he and his family were at risk of becoming homeless.

310.    Despite these representations, the Court denied emergency relief.

**L. Procedural Impact and Denial of Access to Justice**

311.    During the proceeding, the Court stated that Plaintiff's circumstances did not qualify as an "emergency," and compared the legal standard for emergency relief to a hypothetical involving the cutting down of a tree.

312.    The Court further characterized the matter as a "chess game," stating that Plaintiff was "playing

313.    Following the denial of emergency relief, Plaintiff attempted to pursue further judicial remedies, including appellate and follow-up proceedings.

314.    Plaintiff's ability to obtain further review was restricted, including through reliance on prior designations labeling Plaintiff as a vexatious litigant.

315.    These procedural barriers prevented Plaintiff from obtaining a meaningful hearing on the merits of his claims.

**M. Relevance to Claims and Damages**

316.    The denial of emergency relief and subsequent procedural limitations:

   a.    directly contributed to Plaintiff's loss of housing;
   b.    exacerbated Plaintiff's financial and emotional harm; and
   c.    prevented timely intervention that could have mitigated damages.

74

317.   The conduct described herein forms part of a broader pattern in which Plaintiff has been unable to obtain meaningful judicial review despite repeated requests for relief.

---

## XVI. SELECTIVE PROSECUTION, FALSE CHARGES, AND DEPRIVATION OF CIVIL RIGHTS (CRIMINAL PROCEEDINGS AGAINST PLAINTIFF)

318.   Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

### A. Prior Judicial Determination of No Threat

319.   Prior to the criminal charges described herein, Defendants and their agents sought protective relief against Plaintiff.

320.   Such request was presented to a court of competent jurisdiction and was denied, with the court finding insufficient evidence to establish that Plaintiff posed a threat.

321.   This judicial determination establishes that, at that time:

   a.   no imminent danger existed; and
   b.   Plaintiff did not pose a credible threat to the alleged victims.

### B. Sudden Reversal and Criminal Charging

322.   Despite this prior finding, Plaintiff was subsequently charged with third-degree felony electronic harassment based on communications sent months earlier.

323.   The charge was based in part on an email and related communications which:

   a.   contained no explicit threats of physical harm; and
   b.   had been known to the parties for an extended period prior to the filing of charges.

324.   The timing of the charge coincided with Plaintiff's active efforts to pursue civil claims and obtain judicial review against Defendants.

### C. False or Misleading Allegations in Charging Documents

325.   The charging documents alleged that Plaintiff:

   a.   violated a stalking injunction; and
   b.   was a cohabitant of the alleged victim.

326.    These statements were false in that:

    a.    no valid court-issued stalking injunction existed;
    b.    Plaintiff had not been served with any enforceable court order; and
    c.    Plaintiff did not reside with the alleged victim.

## D. Role of Judicial Officer and Disparate Treatment

327.    The matter was assigned to Judge Linda Jones of the Third District Court.

328.    Judge Jones had previously been presented with Plaintiff's civil claims relating to Defendants' conduct and declined to provide a hearing or jury trial on those matters.

329.    Notwithstanding the prior denial of relief in Plaintiff's civil claims, the court proceeded to:

    a.    authorize criminal proceedings against Plaintiff;
    b.    set bail in the amount of approximately $25,000; and
    c.    impose restrictions on Plaintiff's liberty.

## E. Resulting Criminal Record and Economic Harm

330.    As a result of the proceedings described herein, Plaintiff:

    a.    was subjected to probationary conditions;
    b.    had his freedom of movement restricted; and
    c.    acquired a criminal record.

331.    The existence of such record has:

    a.    materially impaired Plaintiff's ability to obtain employment;
    b.    damaged Plaintiff's reputation; and
    c.    caused ongoing economic harm.

## F. Impact on Plaintiff's Civil Litigation

332.    The criminal charges and resulting restrictions had the effect of:

    a.    limiting Plaintiff's ability to travel;
    b.    preventing participation in out-of-state legal proceedings; and
    c.    impairing Plaintiff's ability to pursue claims against Defendants.

333.    These limitations directly interfered with Plaintiff's efforts to seek judicial relief, including proceedings initiated outside the State of Utah.

## G. Pattern of Selective Enforcement

334.    The conduct described herein reflects a pattern in which:

    a.    Plaintiff's allegations of serious financial and fiduciary misconduct were not investigated or prosecuted;
    b.    Plaintiff's requests for hearings and jury trials were denied or ignored; and
    c.    Plaintiff himself was subjected to criminal prosecution.

335.    This disparity supports an inference of selective enforcement and retaliatory use of the criminal justice system.

## H. Deprivation of Constitutional Rights

336.    As a result of the conduct described herein, Plaintiff has been deprived of rights secured by the United States Constitution, including but not limited to:

    a.    the right to due process of law;
    b.    the right to petition the government for redress of grievances;
    c.    the right to a fair and impartial tribunal; and
    d.    the right to pursue lawful employment.

## I. Emotional Distress and Reputational Harm

337.    The actions described herein were undertaken with knowledge that they would cause severe harm to Plaintiff.

338.    Plaintiff has suffered:

    a.    extreme emotional distress;
    b.    humiliation and reputational injury;
    c.    financial devastation; and
    d.    lasting damage to his personal and professional life.

## J. Failure of Adult Protective Services to Investigate Reported Abuse

339.    Plaintiff reported concerns regarding the welfare and financial exploitation of his father to the Utah Division of Adult Protective Services ("APS"), including allegations supported by documentary evidence.

340.    Plaintiff provided APS with substantial materials, including evidence of:

    a.    financial irregularities and alleged fraud;
    b.    unauthorized control over his parents' estate; and
    c.    circumstances surrounding the administration of morphine to Plaintiff's mother and the subsequent transfer of control to Defendant Lisa Stephens.

# XVI. SELECTIVE PROSECUTION, FALSE CHARGES, AND DEPRIVATION OF CIVIL RIGHTS

341.    Despite the volume and seriousness of the evidence presented, APS declined to take further action and closed the investigation.

342.    Plaintiff was informed that the matter had been investigated "within [their] scope" and that he should instead pursue relief through the courts.

343.    The closure of the APS investigation occurred notwithstanding the nature of the allegations and Plaintiff's repeated requests for intervention to protect a vulnerable adult.

344.    This refusal to act is consistent with the broader pattern described herein, in which:

   a.   Plaintiff's reports of alleged misconduct are disregarded;
   b.   no meaningful investigation is undertaken; and
   c.   Plaintiff is redirected to judicial processes that have simultaneously denied him relief.

## K. Repeated Attempts to Obtain Relief from State and Federal Authorities

345.    Over a period of several years, Plaintiff made repeated and sustained efforts to obtain assistance, investigation, and relief from multiple governmental and regulatory bodies.

346.    These efforts included, but were not limited to:

   a.   reporting alleged financial exploitation and abuse to Adult Protective Services;
   b.   presenting evidence to the Salt Lake County District Attorney's Office;
   c.   submitting complaints to the Utah Attorney General's Office;
   d.   filing civil actions in both State and Federal courts;
   e.   submitting complaints to the United States Department of Justice; and
   f.   reporting the matter to federal law enforcement agencies, including the Federal Bureau of Investigation.

## L. Consistent Refusal to Investigate or Intervene

347.    Despite being presented with substantial documentary evidence, including financial records, sworn allegations, and supporting materials, each of the above entities declined to take meaningful action.

348.    Plaintiff's requests for investigation were either:

   a.   ignored;
   b.   redirected without resolution; or
   c.   formally closed without substantive explanation.

349.    In multiple instances, Plaintiff was explicitly instructed to pursue relief through the courts, despite the simultaneous refusal of courts to provide hearings or adjudication on the merits.

## M. Escalation from Reporting to Retaliation

350.    Rather than receiving protection or assistance, Plaintiff was subjected to adverse actions following his repeated reports, including:

   a.   being labeled a vexatious litigant;
   b.   denial of access to further judicial filings; and
   c.   initiation of criminal proceedings against him.

351.    This sequence reflects a transition from Plaintiff acting as a reporting party to being treated as a target of enforcement.

## N. Systemic Failure and Denial of Redress

352.    The cumulative effect of these actions demonstrates that:

   a.   Plaintiff exhausted all reasonable avenues for relief;
   b.   no agency or authority undertook a full and impartial investigation; and
   c.   Plaintiff was left without any meaningful forum in which to present his claims.

353.    The consistent refusal of multiple independent entities to act, despite repeated notice and evidence, raises substantial questions as to whether external considerations influenced such inaction.

## O. Impact on Plaintiff and His Family

354.    As a direct result of the systemic failure described herein, Plaintiff and his family:

   a.   were denied protection from alleged ongoing harm;
   b.   were deprived of access to justice; and
   c.   suffered continued financial, emotional, and personal injury.

## P. Pattern of Attorney Engagement Followed by Withdrawal or Nonperformance

355.    Over a period spanning multiple years, Plaintiff retained or consulted with numerous attorneys and law firms for the purpose of investigating and pursuing claims related to the alleged exploitation of his parents' estate.

356.    These attorneys and firms included, but are not limited to:

   a.   attorneys affiliated with Kirton McConkie, including Craig McCullough, Greg Moesinger, Chris Hill, Ken Olsen, Tom Mecham, and Lee Wright;

79

b.    attorney Kent Snider;

c.    Christensen & Jensen, including George Burbidge;

d.    Rencher Anjewierden, including Jaryl Rencher and Michael Collins;

e.    Hepworth & Associates, including Michael Hepworth and Kyle Hoskins;

f.    Parsons Behle & Latimer, including John Snow, Angus Edwards, and Mindy Kidd; and

g.    other associated legal and professional advisors engaged in connection with the matter.

## Q. Consistent Pattern of Initial Recognition Followed by Inaction

357.    In multiple instances, attorneys engaged by Plaintiff initially acknowledged the seriousness of the underlying issues, including identifying potential conflicts of interest, fiduciary breaches, or other legal violations.

358.    For example, as reflected in the record, one attorney expressly stated that the conduct at issue constituted "jail time," indicating recognition of potential criminal exposure.

359.    Despite such acknowledgments, these attorneys and firms subsequently:

a.    declined to file actions;

b.    withdrew from representation;

c.    failed to pursue agreed-upon legal remedies; or

d.    materially altered claims prior to filing.

## R. Failure to Perform Contracted Legal Services

360.    Plaintiff entered into multiple engagement agreements with counsel, often accompanied by substantial retainers or fee arrangements.

361.    Despite these agreements, Plaintiff alleges that numerous attorneys:

a.    failed to file promised pleadings;

b.    delayed action without justification;

c.    pursued alternative legal strategies inconsistent with Plaintiff's directives; or

d.    terminated representation without resolution.

362.    These patterns resulted in significant financial loss, delay, and continued exposure to alleged harm.

## S. Suppression or Narrowing of Claims

363.   In certain instances, attorneys removed or declined to pursue claims that Plaintiff alleges were central to the dispute, including claims relating to:

   a.   alleged conflicts of interest;
   b.   fiduciary breaches; and
   c.   broader allegations of coordinated misconduct.

364.   Plaintiff was, in some cases, informed that the matters were "too political" or otherwise unlikely to be pursued by authorities.

## T. Interference with Attorney-Client Relationships

365.   The repeated pattern of attorney withdrawal, nonperformance, or refusal to proceed created a practical barrier to Plaintiff obtaining effective legal representation.

366.   Plaintiff alleges that this pattern was not isolated, but rather consistent across multiple independent firms over time.

## U. Inference of Coordinated Conduct

367.   The consistency of outcomes across numerous unrelated attorneys and firms—including initial acceptance, recognition of issues, and subsequent withdrawal or inaction—supports an inference that factors beyond ordinary legal discretion may have influenced such conduct.

368.   Plaintiff alleges that such conduct is consistent with:

   a.   obstruction of potential claims;
   b.   aiding and abetting underlying misconduct; and/or
   c.   participation in a broader pattern of concealment.

# V. Resulting Harm

369. As a result of the conduct described herein, Plaintiff:
a. was repeatedly deprived of legal representation;
b. incurred substantial financial losses through fees paid for unperformed services;
c. experienced prolonged delay in pursuing claims; and
d. was left to proceed pro se in complex litigation.

# W. Systemic Judicial Refusal to Enforce Basic Legal Duties

370. Plaintiff alleges that over a period exceeding five years, more than thirty (30) judges across both state and federal courts were presented with evidence, pleadings, and direct requests for relief relating to the alleged misappropriation of the estate of Max and Joyce Eliason.

**371.** Despite repeated filings, motions, and documented allegations—including requests for **basic statutory accounting of $1.00**—no court required Defendants to produce a single financial record.

## X. NAMED JUDICIAL OFFICERS AND THEIR RESPECTIVE ROLES

**372.** The following judges were directly involved in proceedings related to Plaintiff's claims and are identified based on their rulings, refusals to act, or procedural dismissals:

**State Court Judges (Utah)**
- Judge Adam Mow
- Judge Kara Petit
- Judge Robert Faust
- Judge Rita Cornish
- Judge Linda Jones
- Judge Augustus Chin
- Judge D. Hamilton
- Judge Royal Hansen
- Judge A. Hruby-Mills
- Judge Amber Mettler
- Judge Kent Holmberg
- Judge Patrick Corum
- Judge Todd Shaughnessy

**Federal Judges**
- Chief Judge Robert Shelby (U.S. District Court, Utah)
- Judge Jill Parrish (recused)
- Magistrate Judge Cecilia Romero
- Judge Tim Stewart
- Chief Judge Phillip Brimmer (Colorado)
- Chief Judge John Seabright (Hawaii)
- Chief Judge Barbara Lynn (Texas)

## Y. Pattern of Judicial Conduct

**373.** Across jurisdictions and courts, a consistent pattern emerged:

a. dismissal of claims without hearings;
b. denial of jury trials;
c. failure to compel discovery or accounting;
d. refusal to address threshold legal questions;
e. allowance of defendants to avoid responding to allegations; and
f. designation of Plaintiff as "vexatious" in lieu of adjudicating claims.

82

## Z. Example: Refusal to Require Accounting

**374.** In probate proceedings before Judge Robert Faust, Plaintiff requested a simple and legally required action: that Defendants be compelled to provide an accounting of estate assets.

**375.** Instead of addressing this request, the court:
a. limited Plaintiff's ability to speak;
b. declined to review submitted materials; and
c. deferred or avoided ruling on the accounting request entirely.

The record reflects Plaintiff was given approximately **30 seconds to speak** before being interrupted and denied relief .

## AA. Example: Dismissal Without Hearing (Judge Adam Mow)

376.    Plaintiff's initial complaint, filed in 2019, was dismissed with prejudice by Judge Adam Mow without granting:

   a.   a hearing; or
   b.   a jury trial.

377.    This dismissal prevented the underlying allegations from being heard on their merits and barred future litigation on those claims.

## BB. Federal Court Dismissals Without Substantive Review

378.    Plaintiff filed a civil RICO complaint exceeding 300 pages in federal court.

379.    Chief Judge Robert Shelby dismissed the matter with prejudice despite:

   a.   extensive supporting documentation; and
   b.   allegations involving fiduciary breaches and financial misconduct.

 (Case No. 2:23-cv-00785, including thousands of pages of exhibits)

380.    The matter was dismissed without a hearing or jury trial on the merits of Plaintiff's claims.

## CC. Repeated Jurisdictional Deflection Across States

381.    Plaintiff sought relief in multiple jurisdictions, including:

   • Utah
   • Colorado
   • Hawaii
   • Texas

383.    In each instance, courts declined to proceed, often citing jurisdictional or procedural grounds while not addressing the substantive allegations.

## DD. Probate Court Conduct (Judge Kara Petit)

384.    Plaintiff alleges that Judge Kara Petit:

    a.   acknowledged representation conflicts;
    b.   nevertheless declined to act; and
    c.   designated Plaintiff as vexatious rather than addressing the underlying claims.

385.    This designation effectively restricted Plaintiff's ability to seek relief while leaving the alleged misconduct unexamined.

## EE. Eviction and Property Deprivation (Judge Rita Cornish)

386.    Plaintiff alleges that Judge Rita Cornish authorized proceedings resulting in the loss of Plaintiff's residence without addressing the underlying ownership and fiduciary disputes.

 (Transcript excerpts from occupancy hearing, pages 34–35)

387.    The record reflects that objections were sustained and key questions were prevented from being answered during the proceedings.

## FF. Federal Case Stay and Filing Restrictions (Judge Cecilia Romero)

388.    In federal proceedings, Magistrate Judge Cecilia Romero granted a stay and restricted Plaintiff's ability to file further motions.

389.    This occurred despite:

    a.   multiple discovery requests; and
    b.   the absence of substantive responses from Defendants.

## GG. Cumulative Effect: Denial of Access to Justice

390.    The cumulative effect of the above judicial actions resulted in:

    a.   denial of hearings across multiple courts;
    b.   denial of jury trials;
    c.   denial of discovery;
    d.   denial of statutory accounting; and
    e.   effective foreclosure of judicial remedies.

## HH. Inference of Systemic Breakdown

**391.** The uniformity of judicial outcomes across numerous courts and jurisdictions supports an inference that:

a. Plaintiff's claims were not evaluated on their merits; and
b. systemic factors may have influenced judicial inaction.

## II. The Central Question

**392.** Plaintiff asserts that the central and unanswered question remains: Why has no court required Defendants to account for even $1.00 of estate assets?

## JJ. Weaponization of Counsel to Evict Plaintiff from His Own Home

**393.** Plaintiff incorporates herein the events described in Chapter Thirty-One, titled:

*"You Have Three Days to Vacate Your Own Home… Love, Kirton McConkie"*

**394.** Beginning in or around November 2023, Defendants, through counsel at Kirton McConkie, initiated actions resulting in Plaintiff's removal from a residential property located at 43 South Fairway Drive, North Salt Lake, Utah.

**395.** The property in question was:

a. purchased in 2015 by Plaintiff's mother;
b. provided to Plaintiff as an expression of gratitude for caregiving services; and
c. occupied continuously by Plaintiff for approximately eight (8) years.

As reflected in exhibits, Plaintiff had **no lease agreement**, as the property was not held under a traditional landlord-tenant relationship.

**396.** At all relevant times, Plaintiff was:

a. a 33% owner of Eliason Enterprises, LLC; and
b. a beneficiary of the estate from which the property originated.

## KK. Simultaneous Conflicted Representation

**397.** Plaintiff alleges that Kirton McConkie:

a. previously represented Plaintiff (2016);
b. represented the trust and settlors (Max and Joyce Eliason); and
c. simultaneously represented adverse parties, including other managers and beneficiaries.

**398.** Despite these overlapping roles, the firm initiated legal actions directly adverse to Plaintiff's interests.

## LL. Financial Deprivation Preceding Eviction

**399.** Immediately prior to the eviction action:

a. Plaintiff's legal counsel withdrew after collecting substantial fees; and
b. Kirton McConkie executed on a judgment and reduced Plaintiff's account balance to approximately **$5.00**.

**400.** Plaintiff alleges that this sequence of events:

a. eliminated his ability to retain counsel; and
b. left him financially vulnerable immediately before removal from his residence.

## MM. Formal Notice of Removal and Property Seizure

**401.** On or about February 27, 2024, Plaintiff received a formal notice titled:

"Notice of Abandonment and Request for Removal of Any Personal Property."

The notice, appearing on *page 2*, asserts that Plaintiff was a "tenant" who had abandoned the premises

**402.** Plaintiff disputes this characterization, alleging:

a. no lease agreement existed;
b. no rent obligation existed; and
c. the designation of "tenant" was fabricated to facilitate removal.

## NN. Judicial Authorization of Eviction

403.   The eviction was permitted by Judge Rita Cornish of the Second District Court of Utah.

404.   Plaintiff alleges that the court authorized removal despite:

   a.   evidence of ownership interest;
   b.   absence of a lease; and
   c.   unresolved disputes regarding fiduciary conduct.

## OO. Criminalization of Plaintiff's Presence in His Own Home

405.   Following the eviction:

   a.   a "No Trespassing" notice was posted; and
   b.   Plaintiff was prohibited from entering the property.

(The notice explicitly states that entry could result in criminal prosecution.)

86

406.    Plaintiff alleges that:

    a.    he would be subject to arrest if he entered the home; and
    b.    Defendants effectively converted his own residence into a restricted property against him.

## PP. Continued Vacancy of the Property

407.    Plaintiff further alleges that:

    a.    the property has remained unoccupied; and
    b.    no third party has been permitted to reside therein pending unresolved proceedings.

## QQ. Denial Of Evidentiary Hearing

408.    Plaintiff requested that his father, then elderly and suffering from dementia, be permitted to testify regarding his intent for the property.

409.    This request was denied by:

- Judge Tim Stewart
- Magistrate Judge Cecilia Romero

## RR. Harm to Plaintiff's Family

410.    Plaintiff alleges that the eviction:

    a.    displaced him from his residence;
    b.    caused severe emotional distress; and
    c.    directly impacted his daughters, Kylie and Brittnie.

## SS. Cumulative Effect of Conduct

411.    Plaintiff asserts that the eviction constitutes:

    a.    misuse of legal process;
    b.    exploitation of conflicted representation;
    c.    deprivation of property without due process; and
    d.    coordinated conduct between counsel and judicial officers.

## TT. The Core Indictment

412.    Plaintiff alleges that the following occurred simultaneously:

- his own attorneys acted against him;
- his own company was used as the instrument of removal;
- his own funds were used to finance the action; and
- the court system authorized the result.

## UU. The Question That Remains

413.   Plaintiff respectfully submits that the facts give rise to a singular, unavoidable question:

414.   How can a citizen be lawfully removed from a home he owns, by attorneys who represented him, using his own company and funds, while no court requires even a basic accounting of the estate from which that property originated?

---

## XI. ISOLATION OF PLAINTIFF FROM HIS FATHER, END-OF-LIFE INTERFERENCE, AND POST-DEATH OBSTRUCTION

415.   Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

## A. Longstanding Relationship and Sudden Isolation

416.   Prior to the events described herein, Plaintiff maintained a close and consistent relationship with his father, Max D. Eliason, including regular communication, visits, and involvement in family matters.

417.   There existed no judicial finding, protective order, or lawful basis that would justify restricting contact between Plaintiff and his father.

(No evidence has been produced demonstrating any adjudicated risk posed by Plaintiff.)

418.   Notwithstanding the absence of any lawful restriction, Defendants imposed limitations on Plaintiff's ability to see, speak with, or otherwise communicate with his father.

419.   These restrictions were communicated in a manner implying legal authority, despite the absence of any enforceable court order.

## B. Escalation During Period of Vulnerability

420.   At the time these restrictions were imposed, Defendants were asserting that Max D. Eliason was experiencing significant cognitive decline and was under heightened care, including hospice involvement.

421.   Plaintiff repeatedly requested:

   a.   access to visit his father;
   b.   information regarding his father's medical condition; and
   c.   identification of treating providers.

422.   These requests were denied or obstructed.

(As reflected in communications shown in the evidence, Plaintiff was explicitly told he was "not welcome" and that his presence would be treated as trespassing, harassment, and stalking.)

## C. Denial of Final Visit

423.    In or around October 2024, Plaintiff was informed that his father's condition had rapidly deteriorated and that he was near death.

424.    Plaintiff sought to visit his father to say goodbye and provide support during his final days.

425.    This request was denied.

426.    Plaintiff was prevented from seeing his father prior to his death.

## D. Lack of Transparency Regarding Medical Care

427.    Plaintiff was not provided with:

   a.    the identity of hospice providers;
   b.    access to medical records; or
   c.    an opportunity to independently verify his father's condition.

(As described in evidence, requests for disclosure of hospice information and emergency hearings were rejected.)

428.    These limitations prevented Plaintiff from meaningfully participating in his father's care or understanding the circumstances surrounding his decline.

## E. Circumstances Surrounding Death

429.    Max D. Eliason passed away on or about October 23, 2024.

430.    Plaintiff alleges that:

   a.    the reported cause of death was inconsistent with his prior understanding of his father's health; and
   b.    the rapid decline preceding death was not adequately explained.

Plaintiff asserts that his father had not been previously diagnosed with the condition listed as the cause of death.)

## F. Absence of Autopsy and Independent Verification

431.    No autopsy was performed following the death of Max D. Eliason.

432.    As a result, Plaintiff has been deprived of the ability to independently confirm the cause of death.

## G. Funeral and Burial Irregularities

433.    Plaintiff was not provided with timely notice of funeral arrangements.

434.    Plaintiff was denied the opportunity to participate in:

   a.    funeral planning;
   b.    preparation of an obituary; or
   c.    final memorial proceedings.

(As described in exhibits, Plaintiff discovered that his father had already been buried prior to the communicated funeral date.)

435.    Plaintiff alleges that his father was buried in private without meaningful opportunity for family participation.

## H. Use of Documents and Representations to Exclude Plaintiff

436.    Plaintiff alleges that documents were presented to third parties, including cemetery and funeral personnel, representing that Plaintiff was not authorized to participate.

437.    Plaintiff further alleges that statements were made portraying him as dangerous or unwelcome, resulting in his exclusion.

## I. Temporal Proximity to Litigation

438.    The events described herein occurred during the pendency of litigation involving the estate of Max and Joyce Eliason.

439.    The timing of:

   a.    Plaintiff's restricted access;
   b.    his father's sudden decline; and
   c.    his father's death

   is material to the claims asserted in this action.

## J. Obstruction of Post-Death Inquiry

440.    Following his father's death, Plaintiff sought to investigate and obtain information regarding:

   a.    the circumstances of death;
   b.    the absence of an autopsy; and
   c.    the expedited burial.

441.    In connection with the ongoing defamation action in the State of Utah, Plaintiff issued a subpoena seeking information and testimony relating to these matters.

442.    Kirton McConkie opposed or blocked such subpoena.

443.    The obstruction of discovery into these issues:

    a.    prevents Plaintiff from obtaining information directly relevant to his claims;
    b.    restricts inquiry into events surrounding his father's death; and
    c.    supports an inference that the requested information may be adverse to Defendants.

### K. Cumulative Effect and Harm

444.    As a direct result of the conduct described herein, Plaintiff:

    a.    was deprived of the opportunity to say goodbye to his father;
    b.    was excluded from end-of-life care and decision-making;
    c.    was denied participation in funeral and burial proceedings; and
    d.    was prevented from obtaining information necessary to understand the circumstances of his father's death.

### L. The Unanswered Questions

445.    Plaintiff respectfully submits that the following questions remain unanswered:

    a.    Why was Plaintiff denied access to his father absent any court order?
    b.    Why was information regarding medical care withheld?
    c.    Why was no autopsy performed?
    d.    Why was the burial conducted prior to the communicated funeral date?
    e.    Why is discovery into these matters being obstructed?

446.    Plaintiff does not, at this stage, assert a definitive conclusion as to the cause of his father's death.

447.    However, Plaintiff alleges that the combination of:

- restricted access;
- withheld information;
- absence of independent verification;
- irregular burial procedures; and
- obstruction of inquiry

creates a set of circumstances that warrant full transparency and investigation.

## XII. CONCLUSION AND DEMAND FOR ACCOUNTABILITY

### A. The Sum of What Has Occurred

448.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

449.    This action is not based on a single event, isolated dispute, or misunderstanding.

450.    Rather, it reflects a sustained and interconnected pattern involving:

    a.   the transfer and control of estate assets without accounting;
    b.   the exclusion of Plaintiff from positions of authority and participation;
    c.   the interference with Plaintiff's business and economic opportunities;
    d.   the removal of Plaintiff from his own residence;
    e.   the restriction of Plaintiff's access to his father;
    f.   the denial of meaningful judicial review; and
    g.   the obstruction of discovery and inquiry.

## B. Exhaustion of All Avenues

451.    Plaintiff has sought relief through:

    a.   state courts;
    b.   federal courts;
    c.   law enforcement agencies;
    d.   regulatory authorities; and
    e.   private legal counsel.

452.    In each instance, Plaintiff presented documentation, evidence, and requests for basic procedural remedies, including hearings, discovery, and accounting.

453.    Despite these efforts, Plaintiff has not been provided:

    a.   a full evidentiary hearing on the merits;
    b.   a jury trial;
    c.   meaningful discovery; or
    d.   a complete accounting of estate assets.

## C. The Absence of Accountability

454.    Plaintiff alleges that no court, agency, or authority has required Defendants to account for even a nominal portion of the estate at issue.

455.    The absence of such basic accountability is central to the claims asserted herein.

## D. Personal and Irreparable Harm

456.    As a result of the conduct described throughout this Complaint, Plaintiff has experienced:

    a.   the loss of his home;
    b.   the destruction of his business;
    c.   the loss of financial stability;
    d.   damage to his reputation and employment prospects;

e.   prolonged separation from his father during critical years; and
f.   the inability to be present at the end of his father's life.

## E. The Loss That Cannot Be Recovered

457.   Plaintiff was denied the opportunity to:

a.   say goodbye to his father;
b.   participate in his father's care during his final days;
c.   be present at his father's passing; and
d.   participate in funeral and burial proceedings.

Plaintiff further was not provided:

a.   full information regarding his father's medical care;
b.   independent verification of the circumstances surrounding his death; or
c.   meaningful participation in funeral or burial proceedings.

458.   These losses are permanent and cannot be remedied through monetary compensation alone.

## F. The Remaining Question

459.   Plaintiff respectfully submits that, after years of litigation, filings, and requests, a single question remains unresolved:

460.   Why has no court required Defendants to account for even $1.00?

## G. Request for Relief

461.   Plaintiff seeks relief including, but not limited to:

a.   full accounting of all estate and trust assets;
b.   access to documents and records previously withheld;
c.   appropriate damages for financial and personal harm;
d.   declaratory and injunctive relief as the Court deems just; and
e.   such further relief as is necessary to ensure transparency and accountability.

## H. Final Statement

462.   Plaintiff brings this action not only to obtain relief for himself, but to ensure that the matters described herein are:

a.   examined on their merits;
b.   supported by full disclosure of relevant facts; and
c.   subject to the same standards of accountability that apply to all parties under the law.

463.   Plaintiff respectfully submits that no system of justice can function where:

- access to courts is restricted;
- discovery is obstructed;
- accountability is avoided; and
- individuals are denied the opportunity to be heard.

464.    Plaintiff therefore requests that this Court allow the claims to proceed so that the facts may be fully presented and evaluated.

---

# XIII. CAUSES OF ACTION

## **COUNT I

### STATUTORY ACCOUNTING AND EQUITABLE ACCOUNTING**

**465.** Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

**466.** Plaintiffs allege that Defendants have exercised control over trust assets, estate assets, LLC assets, distributions, proceeds, records, and financial information belonging to or affecting Max D. Eliason, Joyce S. Eliason, their trusts, related entities, and the interests of the beneficiaries.

**467.** Plaintiffs have repeatedly demanded accountings, statements, trust documents, supporting records, and explanations concerning distributions, transfers, fees, expenses, and asset ownership.

**468.** Defendants have failed and refused to provide a full and lawful accounting.

**469.** The information necessary to determine the nature, location, amount, and disposition of assets is uniquely within the possession, custody, or control of Defendants.

**470.** Plaintiffs therefore seek a full statutory and equitable accounting, including but not limited to all trust assets, estate assets, oil and gas revenues, real property proceeds, insurance proceeds, management fees, legal fees, professional fees, tax payments, transfers, distributions, loans, notes, amendments, and beneficiary payments.

**471.** Plaintiffs further seek production of the governing documents for every trust, amendment, certification, related entity, and supporting accounting records.

---

## **COUNT II

### DECLARATORY RELIEF**

**472.** Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

94

**473.** An actual and justiciable controversy exists concerning:

a. who represented Max and Joyce Eliason;
b. whether Kirton McConkie and Craig McCullough lawfully represented the settlors, the trusts, and/or adverse beneficiaries at the same time;
c. whether various trust amendments, certifications, appointments, removals, and related instruments are valid;
d. whether Defendants lawfully exercised authority as trustee, trust protector, personal representative, guardian, conservator, manager, or agent; and
e. whether Plaintiffs are entitled to the records and accountings requested herein.

**474.** Plaintiffs seek declarations that:

a. they are entitled to full accounting and disclosure;
b. no Defendant may rely upon undisclosed or unproduced documents to justify the exercise of authority;
c. any authority obtained through conflicted representation, fraud, concealment, undue influence, forgery, or invalid execution is void or voidable; and
d. Defendants must account for every dollar received, transferred, retained, or distributed.

# **COUNT III

## BREACH OF FIDUCIARY DUTY**

**475.** Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

**476.** Defendants who acted or purported to act as attorneys, trustees, trust protectors, personal representatives, guardians, conservators, managers, fiduciaries, and advisors owed fiduciary duties of loyalty, candor, good faith, impartiality, disclosure, reasonable care, and proper administration.

**477.** Plaintiffs allege that such duties were breached by, among other things:

a. failing to provide required accountings;
b. concealing governing documents;
c. favoring certain beneficiaries over others;
d. acting under undisclosed conflicts of interest;
e. transferring or permitting the transfer of assets without disclosure;
f. removing Plaintiff from fiduciary or managerial roles without lawful basis;
g. using estate and entity assets for unauthorized purposes; and
h. participating in or concealing transactions adverse to the interests of the settlors, beneficiaries, and protected persons.

**478.** Plaintiffs have been damaged by these breaches in an amount to be established by accounting and proof.

## **COUNT IV

### BREACH OF DUTY OF LOYALTY, IMPARTIALITY, AND FULL DISCLOSURE**

**479.** Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

**480.** Where Defendants undertook to act on behalf of a trust, estate, or protected person, they were required to act impartially among beneficiaries and loyally toward the true principals.

**481.** Plaintiffs allege that Defendants instead acted to advance the interests of a favored faction while withholding information from Plaintiffs and restricting their ability to protect their interests.

**482.** Plaintiffs further allege that Defendants failed to disclose material conflicts, adverse relationships, and material facts necessary for informed consent or judicial review.

## **COUNT V

### FRAUD, FRAUDULENT CONCEALMENT, AND FRAUDULENT MISREPRESENTATION**

**483.** Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

**484.** Plaintiffs allege that Defendants made or concealed material representations concerning:

    a. who represented Max and Joyce Eliason;
    b. who represented the trusts;
    c. the validity of trust amendments and appointments;
    d. the status and authority of trustees, managers, personal representatives, and protectors;
    e. the existence or nonexistence of trust documents and beneficiary rights;
    f. the status of Plaintiff's marital relationship;
    g. the existence of lease or occupancy defaults; and
    h. the location, ownership, or disposition of estate and entity assets.

**485.** Plaintiffs allege that such representations and omissions were made knowingly or recklessly, with the intent that others rely on them.

**486.** Plaintiffs, courts, agencies, third parties, and service providers were induced or influenced by those misrepresentations and omissions.

**487.** The resulting harm includes loss of assets, loss of authority, obstruction of access, reputational injury, litigation expense, and emotional harm.

96

## **COUNT VI

**CONSTRUCTIVE FRAUD****

**488.** Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

**489.** By reason of fiduciary, confidential, professional, or controlling relationships, Defendants were obligated to exercise utmost honesty and disclosure.

**490.** Even where intent is disputed, Plaintiffs allege that Defendants obtained or retained advantage through breach of confidence, concealment, nondisclosure, and misuse of superior position.

**491.** Such conduct constitutes constructive fraud and requires full accounting, restitution, rescission, surcharge, and such other relief as equity permits.

## **COUNT VII

**CIVIL CONSPIRACY****

**492.** Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

**493.** Plaintiffs allege that multiple Defendants agreed, expressly or tacitly, to accomplish unlawful objectives and/or lawful objectives by unlawful means, including concealment of conflicts, denial of accountings, suppression of records, interference with fiduciary rights, and consolidation of control over assets and access.

**494.** Overt acts in furtherance of the conspiracy include, but are not limited to:

   a. preparation and use of disputed amendments, certifications, and role changes;
   b. removal of Plaintiff from fiduciary and managerial positions;
   c. refusal to disclose trust records;
   d. eviction proceedings;
   e. restrictions on Plaintiff's contact with his father;
   f. use of third parties, attorneys, agencies, and courts to reinforce control; and
   g. obstruction of discovery, including opposition to subpoenas.

**495.** Plaintiffs have suffered damage as a direct and proximate result of the conspiracy.

## **COUNT VIII

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY, FRAUD, AND CONCEALMENT****

**496.** Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

**497.** Plaintiffs allege that certain Defendants, even if not primary actors in every underlying transaction, had actual knowledge of material misconduct and substantially assisted, enabled, ratified, concealed, or benefited from it.

**498.** Such assistance included litigation conduct, refusal to disclose, strategic withdrawals, nonperformance, coercive communications, support of disputed authority, and obstruction of inquiry.

---

# **COUNT IX

## TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS / ECONOMIC EXPECTANCY**

**499.** Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

**500.** Plaintiff had valid economic relationships and expectancies, including but not limited to:

      a. trust and estate distributions;
      b. managerial and ownership rights in family entities;
      c. revenues from oil, gas, and real estate holdings;
      d. the business opportunity associated with My 3-D Me; and
      e. continued housing and financial stability.

**501.** Defendants knew of these relationships and expectancies.

**502.** Defendants intentionally interfered with them through concealment, unauthorized transfers, role removals, business sabotage, litigation pressure, and financial strangulation.

**503.** As a result, Plaintiff suffered loss of income, destruction of business, foreclosure exposure, asset loss, credit harm, and ongoing economic injury.

---

# **COUNT X

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**504.** Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

**505.** Plaintiffs allege that Defendants engaged in extreme and outrageous conduct beyond all bounds of decency, including:

> a. isolating Plaintiff from his father;
> b. obstructing Plaintiff's ability to say goodbye before his father's death;
> c. restricting access to information surrounding his father's decline and death;
> d. excluding Plaintiff from funeral, obituary, and burial decisions;
> e. evicting Plaintiff from his own home;
> f. using criminal accusations and vexatious labels to silence Plaintiff; and
> g. refusing to account for estate assets while using those same assets against the victims.

**506.** Defendants knew, or should have known, that such conduct would cause severe emotional distress.

**507.** Plaintiffs allege severe and lasting emotional injury as a result.

---

# **COUNT XI

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (IN THE ALTERNATIVE)**

**508.** Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

**509.** In the alternative, to the extent any Defendant contends that the conduct described was not intentional, Plaintiffs allege it was at minimum negligent, reckless, and undertaken in disregard of obvious risk of devastating emotional harm.

---

# **COUNT XII

## CONVERSION, CIVIL THEFT, AND WRONGFUL DOMINION OVER PROPERTY**

**510.** Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

**511.** Plaintiffs allege that Defendants exercised dominion and control over money, distributions, revenues, records, real property interests, trust interests, business interests, and personal property inconsistent with the rights of Plaintiffs and the lawful rights of Max and Joyce Eliason.

**512.** Such conduct includes the withholding, diversion, seizure, transfer, garnishment, and concealment of assets without lawful justification or accounting.

**513.** To the extent precise amounts cannot presently be identified, that inability is itself the product of Defendants' refusal to account.

# **COUNT XIII

## UNJUST ENRICHMENT / RESTITUTION

**514.** Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

**515.** Defendants have received money, authority, fees, property, leverage, benefits, and strategic advantage under circumstances that make retention inequitable.

**516.** Plaintiffs seek restitution, disgorgement, surcharge, constructive trust, and clawback as to all benefits wrongfully received or retained.

# **COUNT XIV

## ABUSE OF PROCESS / MISUSE OF LEGAL PROCESS**

**517.** Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

**518.** Plaintiffs allege that legal process and legal threats were used not for legitimate adjudication, but to silence inquiry, force compliance, isolate Plaintiff, obtain leverage, and preserve control over disputed assets and information.

**519.** This includes, among other things:

    a. using proceedings to restrict access to Plaintiff's father;
    b. using conflicted counsel to advance adverse positions;
    c. using judgment and garnishment to financially disable Plaintiff;
    d. using eviction proceedings to remove Plaintiff from his home; and
    e. blocking subpoenas and discovery into core factual questions.

# **COUNT XV

## BREACH OF CONTRACT / BREACH OF PROFESSIONAL UNDERTAKING TO THE EXTENT APPLICABLE**

**520.** Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

**521.** To the extent any Defendant undertook contractual or professional obligations to represent, protect, advise, administer, or account for the interests of Max and Joyce Eliason,

100

their estate, their trusts, or the beneficiaries, Plaintiffs allege those obligations were materially breached.

**522.** Such breaches include failure to provide the very services for which fees were charged, including honest administration, impartial representation, fiduciary disclosure, and lawful accounting.

---

# **COUNT XVI

## DECLARATION OF INVALIDITY / RESCISSION OF CONFLICTED OR FRAUD-TAINTED INSTRUMENTS**

**523.** Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

**524.** Plaintiffs seek a declaration that any instrument, amendment, certification, appointment, resignation, removal, or transfer procured through fraud, concealment, incapacity, conflict of interest, lack of authority, forgery, or undue influence is void or voidable.

**525.** Plaintiffs further seek restoration of the parties and the estate structures to the extent equity permits, as though such wrongful transactions had not occurred.

---

# **COUNT XVII

## CONSTRUCTIVE TRUST / RESULTING TRUST / CLAWBACK RELIEF**

**526.** Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

**527.** Because specific assets, distributions, trust proceeds, oil revenues, real estate proceeds, fees, and other benefits were allegedly diverted or retained through misconduct, Plaintiffs seek the imposition of constructive trusts, resulting trusts, equitable liens, tracing, and clawback remedies over all such property and proceeds.

---

# **COUNT XVIII

## INJUNCTIVE RELIEF**

**528.** Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

**529.** Plaintiffs seek such temporary, preliminary, and permanent injunctive relief as necessary to:
a. prevent further transfers or concealment of assets;
b. require preservation of records, communications, medical records, funeral records, trust

records, and financial records;
c. prohibit destruction or spoliation of evidence; and
d. compel cooperation with accounting and discovery.

---

## **COUNT XIX

### RELIEF CONCERNING END-OF-LIFE DECISIONS, POST-DEATH TRANSPARENCY, AND OBSTRUCTION OF INQUIRY**

530. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

531. Plaintiffs allege that the circumstances surrounding the decline, death, funeral handling, burial timing, and post-death concealment concerning Max D. Eliason raise material concerns requiring disclosure and judicial scrutiny.

532. Plaintiffs do not ask this Court, at this stage, to make a criminal finding.

533. Rather, Plaintiffs ask the Court to require disclosure of:
a. hospice information;
b. treating providers;
c. communications concerning end-of-life decisions;
d. funeral and cemetery instructions;
e. documents relied upon to exclude Plaintiff;
f. reasons no autopsy was performed; and
g. any communications relating to the decision to bury Max D. Eliason before Plaintiff could meaningfully participate or before independent review could occur.

534. Plaintiffs further allege that efforts to block subpoena discovery into these issues support the need for court-supervised disclosure.

---

## **COUNT XX

### SUCH OTHER CLAIMS AS PROOF MAY SUPPORT**

535. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

536. Because Defendants have withheld records central to the claims, Plaintiffs reserve the right to conform the pleadings to the proof, amend counts, clarify theories, and assert additional causes of action supported by materials disclosed through accounting, discovery, subpoena compliance, or judicial review.

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment and orders as follows:

**A.** Ordering a complete statutory and equitable accounting of all relevant trusts, estates, entities, revenues, proceeds, fees, transfers, distributions, insurance proceeds, and related records;

**B.** Requiring Defendants to produce all governing trust documents, amendments, certifications, estate records, account statements, tax returns, ledgers, communications, medical and hospice records to the extent lawfully subject to disclosure, funeral and burial records, and all other records necessary to determine what occurred;

**C.** Awarding Plaintiffs nominal damages of **$1.00** at minimum, so that the record reflects that a wrong occurred even before the full amount is known;

**D.** Awarding **treble damages as to any amount, asset, transfer, fee, distribution, or property that Defendants cannot lawfully explain, justify, or account for**;

**E.** Imposing constructive trust, equitable lien, surcharge, restitution, disgorgement, tracing, rescission, clawback, or any other equitable remedy necessary to restore what belongs to the estate, the trusts, and the rightful beneficiaries;

**F.** Entering declaratory relief concerning the invalidity or voidability of any role, instrument, amendment, removal, appointment, transfer, or certification obtained through conflict, fraud, concealment, incapacity, forgery, or lack of authority;

**G.** Issuing injunctive relief preventing further concealment, transfer, destruction, or dissipation of records and assets;

**H.** Awarding costs, fees, and such additional relief as the Court deems just and proper;

**I.** Referring any matter the Court believes may warrant criminal review, professional discipline, fiduciary review, or regulatory investigation to the appropriate authorities, as the Court deems appropriate;

**J.** Granting such other and further relief, whether legal or equitable, as justice may require.

**Plaintiffs are not asking this Court to guess, speculate, or rescue them from the truth. Plaintiffs ask only that Defendants be required to account for what they took, explain what they did, and submit to the same law they have thus far used as a shield. Whether the court wants to prosecute alleged criminals or keep it hidden from the public is up to them, but there never should be a situation where demanding accounting for a missing estate should be denied.**

DATED this 20th day of April, 2026.

Respectfully submitted,


_____
Brett L. Eliason (brett.eliason1@gmail.com)
Plaintiff, Pro Se


_____
Véronique Eliason (veroniqueeliason88@gmail.com)
Plaintiff, Pro Se


_____
Kylie Eliason (kylie.eliason@icloud.com)
Plaintiff, Pro Se


_____
Brittnie Eliason (britz.eliason@gmail.com)
Plaintiff, Pro Se


Address:
36 Timber Trail
Ramsey, NJ, 07446
Telephone: 801-949-0080

# EXHIBIT INDEX

A. Partial list of complaints filed by Plaintiffs in State and Federal Courts since Feb 11th,2019.
B. First complaint filed in State of Utah under Judge Adam Mow.
C. Vexatious Litigant ruling from Probate Judge Kara Petit.
D. Filing made to Judge Kara Petit just days before her Vexatious Litigant ruling.
E. Complaint filed in Third District Court in September 2019 by attorney Jaryl Rencher.
F. Complaint filed in Third District Court in August 2023 by attorney John Snow.
G. Extortion letter sent by Kirton McConkie to Plaintiff on March 6th, 2026.
H. Introductory letter from Bryan Stephens introducing Craig McCullough under Fraudulent Misrepresentation.
I. Email sent from Board of Directors member Tom Mecham of Kirton McConkie to Plaintiff confirming their "undisclosed conflict of interest."
J. First Amendment to The Eliason 2016 Trust requiring unanimous decisions.
K. Document executed by Craig McCullough removing Brett as Trustee despite the Amendment.
L. Governing Documents of Eliason Eight, LLC requiring unanimous decision on all decisions.
M. Amended and governing documents for Eliason Eight, LLC showing Brett L Eliason as Manager.
N. Amended documents created by Kirton McConkie unlawfully removing Brett L Eliason as Manager.
O. Fraudulent documents installing both Laurie Eliason and Jason Stephens as managers.
P. Original Amended and Restated Articles of Organization of Eliason Enterprises, LLC requiring unanimous manager authorization on all major decisions.
Q. Fraudulent documents created by Craig McCullough removing Plaintiff as Manager despite the governing documents on record.
R. Joyce S Eliason A/B Trust dated 10-28-2015; considered void due to criminal conflict of interest.
S. Second Amendment to the Joyce Eliason Trust dated April 17th, 2018 executed without Max Eliason as Settlor, and unlawfully putting Lisa Stephens in as sole Trustee in place of her own father; Max D Eliason (fraud).
T. Third Amendment of Joyce Eliason Trust dated May 4th, 2018; confirming more criminal activities while forcing a woman one day out of a morphine induced coma to give more control to Lisa Stephens.
U. The Eliason 2015 Trust created by Craig McCullough which made him a beneficiary; and giving him and Lisa Stephens the right to embezzled tens of millions in oil properties while Max and Joyce Eliason were still living.
V. The Eliason 2016 Trust created to embezzle remaining 55% cash flow from Eliason Eight, LLC and serves no purpose today other than to continue to steal.
W. Forged electronic signatures of Max D Eliason and Brett L Eliason fraudulently giving Lisa Stephens control of the Eliason Estate, and making her beneficiary of undisclosed life insurance policies.
X. Unlawful Cease and Desist letters designed for character assassination and depriving Plaintiff the right to see his own father for five years until  his suspicious death in 2024.
Y. Miscellaneous documents each of which point to unspeakable retaliatory crimes, and proof of service to Kash Patel and Pamela Bondi.
Z. Publications for the courts review.